**BRITISH STEEL PLC, Plaintiff,**

v.

**UNITED STATES, Defendant.**

**USINAS SIDERURGICAS de MINAS GERAIS, S.A., et al., Plaintiffs,**

v.

**UNITED STATES, Defendant.**

**INLAND STEEL INDUSTRIES, INC., et al., Plaintiffs,**

v.

**UNITED STATES, Defendant.**

**LTV STEEL CO., INC., et al., Plaintiffs,**

v.

**UNITED STATES, Defendant.**

**LACLEDE STEEL CO., et al., Plaintiffs,**

v.

**UNITED STATES, Defendant.**

**LUKENS STEEL CO., INC., et al., Plaintiffs,**

v.

**UNITED STATES, Defendant.**

**Nos. 93–09–00550–CVD, 93–09–00558–CVD, 93–09–00567–CVD to 93–09–00570–CVD.**

United States Court of International Trade.

June 4, 1996.

Steptoe & Johnson (Richard O. Cunningham, Peter Lichtenbaum) (Sheldon E. Hochberg, William L. Martin, II), on brief (Richard O. Cunningham, Sheldon E. Hochberg), on oral argument, Counsel for British Steel plc; Morgan, Lewis & Bockius (Mark R. Joelson) (Marcela B. Stras, Roger C. Wilson), on brief, Counsel for the Government of the United Kingdom, et al.; Dewey Ballantine (Michael H. Stein) (Alan Wm. Wolff, Thomas R. Howell, Martha J. Talley, John A. Ragosta, Guy C. Smith, John R. Magnus, Jeffrey D. Nuechterlein, Philip Karter, Michael R. Geroe, Jennifer Danner Riccardi), on brief, (Martha J. Talley, John A. Ragosta), on oral argument, Counsel for Geneva Steel, et al.; Skadden, Arps, Slate, Meagher &

Flom (John J. Mangan, Robert E. Lighthizer) (D. Scott Nance, Barry J. Gilman), on brief (D. Scott Nance, Barry J. Gilman), on oral argument, Counsel for Geneva Steel, et al.

Willkie Farr & Gallagher (Christopher S. Stokes) (William H. Barringer, Nancy A. Fischer), on brief (Christopher S. Stokes), on oral argument, Counsel for USIMINAS; Dickstein Shapiro & Morin (Arthur J. Lafave, III, Douglas N. Jacobson), Counsel for Companhia Siderurgica Nacional; Skadden, Arps, Slate, Meagher & Flom (Robert E. Lighthizer, John J. Mangan) (Barry J. Gilman, D. Scott Nance), on brief (Barry J. Gilman, Scott Nance), on oral argument, Counsel for Gulf States Steel, Inc., et al.; Dewey Ballantine (Michael H. Stein) (Alan Wm. Wolff, John A. Ragosta, Guy C. Smith, Michael R. Geroe), on brief (John A. Ragosta), on oral argument, Counsel for Gulf States Steel, Inc., et al.

Dewey Ballantine (Michael H. Stein) (Alan Wm. Wolff, Martha J. Talley, John A. Ragosta, John R. Magnus, Jeffrey D. Nuechterlein, Jennifer Danner Riccardi), on brief (Martha J. Talley, John A. Ragosta, John R. Magnus), on oral argument, Counsel for Inland Steel Indus., Inc., et al.; Skadden, Arps, Slate, Meagher & Flom (John J. Mangan, Robert E. Lighthizer) (D. Scott Nance), on brief (Barry J. Gilman, D. Scott Nance), on oral argument, Counsel for Inland Steel Indus., Inc., et al.; Weil, Gotshal & Manges LLP (Stuart M. Rosen) (M. Jean Anderson, Jeffrey P. Bialos, Diane M. McDevitt, Scott Maberry; and Stuart M. Rosen, Mark F. Friedman, Jonathan Bloom), on brief (M. Jean Anderson, Stuart M. Rosen), on oral argument, Counsel for Usinor Sacilor, Sollac and GTS.

Dewey Ballantine (Michael H. Stein) (Alan Wm. Wolff, Martha J. Talley, John A. Ragosta, Guy C. Smith, O. Julia Weller, Kristen M. Neller, Michael R. Geroe), on brief (John A. Ragosta, Guy C. Smith), on oral argument, Counsel for LTV Steel Co., et al.; Skadden, Arps, Slate, Meagher & Flom (John J. Mangan, Robert E. Lighthizer) (D. Scott Nance), on brief (D. Scott Nance), on oral argument, Counsel for LTV Steel Co., et al.; Sharretts, Paley, Carter & Blauvelt, P.C. (Gail T. Cu-

mins), Counsel for Thyssen Stahl AG, et al.; LeBoeuf, Lamb, Greene & MacRae, L.L.P. (Pierre F. de Ravel d'Esclapon, Mary Patricia Michel), Counsel for AG der Dillinger Hüttenwerke; Hogan & Hartson (Lewis E. Leibowitz, Steven J. Routh, Paul Minorini), Counsel for Fried, Krupp AG Hoesch–Krupp, et al.

Dewey Ballantine (Michael H. Stein) (Alan Wm. Wolff, Martha J. Talley, John A. Ragosta, Linda C. Menghetti, Jeffrey D. Nuechterlein, Jennifer Danner Riccardi), on brief (John A. Ragosta, Jeffrey D. Nuechterlein, Jennifer Danner Riccardi), on oral argument, Counsel for Laclede Steel Co., et al., Armco Steel Co., et al. and Bethlehem Steel Corp., et al.; Skadden, Arps, Slate, Meagher & Flom (John J. Mangan, Robert E. Lighthizer) (D. Scott Nance), on brief (D. Scott Nance), on oral argument, Counsel for Laclede Steel Co., et al., Armco Steel Co., et al., and Bethlehem Steel Corp., et al.; Morrison & Foerster (Donald B. Cameron) (Julie C. Mendoza, Craig A. Lewis, Sue–Lynn Koo, Panagiotis C. Bayz), on brief (Donald B. Cameron, Julie C. Mendoza), on oral argument, Counsel for Dongbu Steel Co., et al.

Dewey Ballantine (Michael H. Stein) (Alan Wm. Wolff, Martha J. Talley, John A. Ragosta, Guy C. Smith, Scott L. Forseth, Michael R. Geroe), on brief (John A. Ragosta), on oral argument, Counsel for Lukens Steel Co., et al.; Skadden, Arps, Slate, Meagher & Flom (John J. Mangan, Robert E. Lighthizer), (D. Scott Nance), on brief (D. Scott Nance), on oral argument, Counsel for Lukens Steel Co., et al.; Shearman & Sterling (Jeffrey M. Winton) (Robert E. Herzstein, Shavit Matias), on brief, Counsel for Altos Hornos de Mexico, S.A. de C.V.

Dewey Ballantine (Michael H. Stein) (Alan Wm. Wolff, Martha J. Talley, John A. Ragosta, Michael R. Geroe), on brief (Martha J. Talley, Michael R. Geroe), on oral argument, Counsel for Geneva Steel, et al.; Barnes, Richardson & Colburn (Gunter von Conrad), Counsel for Fabrique de Fer Charleroi, S.A.; LeBoeuf, Lamb, Greene & MacRae (Melvin S. Schwechter), Counsel for S.A. Forgess de Clabecq; O'Melveny & Myers (Peggy A. Clarke, Gary N. Horlick), Counsel for Sidmar N.V. and TradeARBED, Inc.

Frank W. Hunger, Assistant Attorney General of the United States; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (A. David Lafer); Stephen J. Powell (Terrence J. McCartin, Robert E. Nielsen, David W. Richardson, Elizabeth C. Seastrum, Marguerite Trossevin), on brief, Office of Chief Counsel for Import Administration, United States Department of Commerce, of Counsel, Counsel for defendant.

## OPINION

CARMAN, Judge:

The following actions were consolidated by order of the Court of International Trade (Court or CIT) dated February 4, 1994: *British Steel plc v. United States,* Court No. 93–09–00550–CVD and *Geneva Steel, et al. v. United States,* Court No. 93–09–00572–CVD consolidated as *British Steel plc v. United States,* Consol. Court No. 93–09–00550–CVD; *Usinas Siderurgicas de Minas Gerais, S.A. v. United States,* Court No. 93–09–00558–CVD, *Gulf States Steel, Inc. of Alabama, et al. v. United States,* Court No. 93–09–00574–CVD, and *Usinas Siderurgicas de Minas Gerais, S.A. v. United States,* Court No. 93–09–00578–CVD consolidated as *Usinas Siderurgicas de Minas Gerais, S.A. v. United States,* Consol. Court No. 93–09–00558–CVD; *Inland Steel Industries, Inc., et al. v. United States,* Court No. 93–09–00567–CVD, *Usinor Sacilor, et al. v. United States,* Court No. 93–09–00588–CVD, *Usinor Sacilor, et al. v. United States,* Court No. 93–09–00589–CVD, *Usinor Sacilor, et al. v. United States,* Court No. 93–09–00590–CVD, and *Usinor Sacilor, et al. v. United States,* Court No. 93–09–00591–CVD consolidated as *Inland Steel Industries, Inc., et al. v. United States,* Consol. Court No. 93–09–00567–CVD; *LTV Steel Co., Inc., et al. v. United States,* Court No. 93–09–00568–CVD, *Thyssen Stahl AG, et al. v. United States,* Court No. 93–09–00585–CVD, *AG der Dillinger Hüttenwerke v. United States,* Court No. 93–09–00596–CVD, and *Fried. Krupp AG Hoesch–Krupp and Krupp Hoesch Stahl AG v. United States,* Court No. 93–09–00603–CVD consolidated as *LTV Steel Co., Inc., et al. v. United States,*

Consol. Court No. 93–09–00568–CVD; *Laclede Steel Co., et al. v. United States,* Court No. 93–09–00569–CVD, *Pohang Iron & Steel Co., Ltd. v. United States,* Court No. 93–09–00579–CVD, *Dongbu Steel Co. Ltd., et al. v. United States,* Court No. 93–09–00580–CVD, *Dongbu Steel Co. Ltd., et al. v. United States,* Court No. 93–09–00581–CVD, and *Pohang Iron & Steel Co., Ltd. v. United States,* Court No. 93–09–00582–CVD consolidated as *Laclede Steel Co., et al. v. United States,* Consol. Court No. 93–09–00569–CVD; *Lukens Steel Co., et al. v. United States,* Court No. 93–09–00570–CVD, *Altos Hornos de Mexico, S.A. de C.V. v. United States,* Court No. 93–09–00618–CVD, and *Industrias Monterrey S.A. de C.V. v. United States,* Court No. 93–09–00632–CVD consolidated as *Lukens Steel Co., et al. v. United States,* Consol. Court No. 93–09–00570–CVD;[1] and *Geneva Steel, et al. v. United States,* Court No. 93–09–00566–CVD and *Fabrique de Fer de Charleroi v. United States,* Court No. 93–09–00599–CVD, consolidated as *Geneva Steel, et al. v. United States,* Consol. Court No. 93–09–00566–CVD.[2]

After several scheduling conferences and upon review and consideration of the minutes of the December 15, 1993, scheduling conference and upon agreement of all parties and pursuant to U.S. CIT R. 42(a), the Court entered the scheduling order governing the joint proceeding in the above-captioned cases. As a convenience to the parties, the Court used *British Steel PLC v. United States,* Consol. Court No. 93–09–00550–CVD to identify this joint proceeding and to establish the guidelines set forth in the February 18, 1994, scheduling order. In accordance with that order, the parties were jointly ordered to brief five general issues which were divided into two groups. General Issues—Group One pertains to: (a) the Department of Commerce's (Department or Commerce) use of a fifteen-year allocation period to determine the benefit from several nonrecur-

ring countervailable grants; (b) Commerce's use of a grant methodology to countervail equity infusions into an unequityworthy company whose shares are not publicly traded; and (c) Commerce's treatment of privatization and restructuring regarding previously received subsidies, including the Department's use of a repayment methodology. General Issues—Group Two pertains to: (a) Commerce's determination of the appropriate sales denominator to be used in subsidy calculations when a respondent's total sales include not only sales of domestically produced merchandise, but also sales of merchandise produced in one or more foreign countries; and (b) Commerce's treatment of disproportionality for the purpose of evaluating the specificity of a potentially countervailable program. The Scheduling Order directed all questions of law and issues of fact regarding the five general issues to be briefed solely in the context of the briefs on these issues. All parties were prohibited from re-briefing or re-arguing any of these questions or issues in the context of the briefs on the country-specific issues. The Court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (1988).

## STANDARD OF REVIEW

The appropriate standard for the Court's review of a remand determination by Commerce is whether the agency's determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988) (current version at 19 U.S.C. § 1516a(b)(1)(B)(i) (1994)). "Substantial evidence is something more than a 'mere scintilla,' and must be enough reasonably to support a conclusion." *Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 405, 636 F.Supp. 961, 966 (1986), *aff'd,* 5 Fed.Cir. (T) 77, 810 F.2d 1137 (1987) (citations omitted).

---

1. *Industrias Monterrey S.A. de C.V. v. United States,* Court No. 93–09–00632–CVD, was consolidated under *Lukens Steel Co., et al. v. United States,* Consol. Court No. 93–09–00570–CVD, by order of this Court on December 9, 1994.

2. The Court notes that *Empresa Nacional Siderurgica, S.A. v. United States,* Court No. 93–09–00625–CVD, was also a part of this joint pro-

ceeding. *See British Steel PLC v. United States,* Consol. Court No. 93–09–00550–CVD at 11 (CIT Feb. 18, 1994) (scheduling order). The Court further notes that the parties represented in *Empresa Nacional Siderurgica, S.A. v. United States,* Court No. 93–09–00625–CVD, filed a voluntarily stipulated dismissal pursuant to which that action was dismissed on January 25, 1995.

SECTION ONE: ALLOCATION

On the general issue of the allocation methodology, Usinor Sacilor, Sollac, GTS, and British Steel plc (collectively "plaintiffs") filed a joint motion for partial judgment on the agency record pursuant to U.S. CIT R. 56.2 and for an order declaring that aspect of the *General Issues Appendix* appended to *Certain Steel Products from Austria,* 58 Fed. Reg. 37,225, 37,225–31 (Dep't Comm.1993) (final determ.) (*General Issues Appendix*) pertaining to the allocation methodology employed by Commerce as set forth in the *General Issues Appendix* and applied in the final countervailing duty determinations in *Certain Steel Products from France,* 58 Fed. Reg. 37,304 (Dep't Comm.1993) (final determ.) (*French Final Determination*)[3] and *Certain Steel Products from the United Kingdom,* 58 Fed.Reg. 37,393 (Dep't Comm. 1993) (final determ.) (*British Final Determination*)[4] to be unsupported by substantial evidence on the record and not otherwise in accordance with law. Commerce opposed plaintiffs' motion, as did AK Steel Corporation, Bethlehem Steel Corporation, Geneva Steel, Gulf States Steel Incorporated of Alabama, Inland Steel Industries, Incorporated, Laclede Steel Company, LTV Steel Company, Incorporated, Lukens Steel Company, National Steel Corporation, Sharon Steel Corporation, U.S. Steel Group a unit of USX Corporation, and WCI Steel, Incorporated (collectively "Domestic Producers").

On February 9, 1995, this Court issued an opinion addressing all five general issues. *See British Steel plc v. United States,* 879 F.Supp. 1254 (CIT 1995) (*British Steel*). On the general issue of the allocation methodology, this Court held: (1) Commerce failed to allocate the benefits of the subsidies received by the firms under investigation in a manner reflecting the actual "commercial and competitive benefit" of the subsidies to the companies and thus the determinations conflicted with Congress' clearly expressed intent; (2) Commerce's use of a 15–year allocation period based solely on the U.S. Internal Revenue Service's Class Life Asset Depreciation Range System[5] (IRS tax tables) was unsupported by substantial evidence on the record and was not otherwise in accordance with law; and (3) the allocation methodology as set forth in the *General Issues Appendix* was unlawful. *See id.* at 1298. Accordingly, the Court remanded the *French Final Determination* and the *British Final Determination* to Commerce. The Court directed Commerce to reexamine the allocation methodology as employed in both final determinations for a case by case examination of the relevant commercial and competitive factors of the firms under investigation occasioned by receipt of the subsidies at issue. After having examined such factors, Commerce was to determine if those factors, when examined with or without a proxy such as the IRS tax tables, led to a method of allocating the benefits of nonrecurring subsidies that reasonably reflected the commercial and competitive advantages enjoyed by the firms receiving such subsides.[6]

This part of the opinion addresses Commerce's *Final Results of Redetermination Pursuant to Court Remand on General Issue of Allocation* (dated June 30, 1995) (*Allocation Remand*).

BACKGROUND

A. *The Allocation Methodology*

As explained in *British Steel,* in allocating the economic benefits of nonrecurring subsi-

---

3. Commerce amended the *French Final Determination* on August 17, 1993. *See Certain Steel Products from France,* 58 Fed.Reg. 43,759 (Dep't Comm.1993) (order and am. final determ.).

4. Commerce amended the *British Final Determination* on August 17, 1993. *See Certain Steel Products from the United Kingdom,* 58 Fed.Reg. 43,748 (Dep't Comm.1993) (order and am. final determ.).

5. Rev.Proc. 77–10, 1977–1 C.B. 548, *superseded by* Rev.Proc. 83–35, 1983–1 C.B. 745, *made obsolete by* Rev.Proc. 87–56, 1987–2 C.B. 674.

6. In the case of the *British Final Determination,* however, Commerce's carrying out of the allocation remand instructions in *British Steel* was conditioned upon Commerce first finding parties in the *British Final Determination* liable for countervailing duties. Commerce subsequently found British Steel PLC liable for countervailing duties in the remand on the general issue of privatization, which finding this Court has upheld. *See British Steel PLC v. United States,* 924 F.Supp. 139, 191 (CIT 1996).

dies, Commerce apportions the value of the subsidies over a number of years beginning with the year of receipt. The countervailing duty (CVD) statute is silent, however, as to the methodology to be employed in allocating subsidy benefits. Since 1982, Commerce's practice has been to allocate benefits from nonrecurring subsidies, such as grants and equity, over the average useful life (AUL) of renewable physical assets as set out in the IRS tax tables. Because the IRS tax tables set the AUL of renewable assets in the steel industry at 15 years, Commerce established an allocation period of 15 years for the subsidy benefits in the *French Final Determination* and the *British Final Determination.*

B. *The* Allocation Remand

1. The Average Useful Life Methodology

Commerce determined the AUL methodology to be the most reasonable allocation methodology complying with the Court's instructions in *British Steel.* To explain its use of AUL to determine the appropriate time period over which to allocate subsidy benefits, Commerce notes two basic accounting principles: (1) the principle that the "actual duration of the commercial or competitive benefit associated with a grant or equity infusion is almost always indeterminate"; and (2) the recognition "that the exact nature of the expenditure of the grant or equity funds ... is not relevant to the question of commercial and competitive benefit." *Allocation Remand* at 6. Notwithstanding the difficulties raised by these principles, Commerce continues, the agency is charged with basing its choice of a reasonable time period on the "commercial and competitive factors for the firms under investigation." *Id.* at 7. Of these factors, Commerce isolates production as the essential factor: "[T]he competitive position of any company ultimately depends upon its productive activity; without production, there are no other commercial and competitive factors that are relevant for a manufacturing enterprise." *Id.* This finding is in accord with the CVD statute, Commerce states, because the "statute focuses on benefits to *production* of the subject merchandise." *Id.* (citing 19 U.S.C. § 1303(a)(1)

(1988) (providing that a duty equal to the net amount of a bounty or grant shall be paid on "any bounty or grant upon the manufacture or production or export" of the subject merchandise)). "A company's renewable physical assets," Commerce explains, "are reasonably related to the productive activity of a firm in that the renewable physical assets are absolutely essential to production; and renewable physical assets have a determinable average useful life. The AUL has competitive significance because the renewal of physical assets is essential to production." *Id.* Commerce recognizes that other factors relate to a company's production other than physical assets, such as employees, land, buildings, and raw materials, but notes that

> with the exception of land and buildings, only physical assets (capital equipment and machines) have an identity which cannot be separated from the firm because capital assets are owned and controlled by the firm; they are the substance within the corporate form. As such, they comprise the core element of a company's productive activities and thus bear a measurable relationship to the duration of subsidy benefits.

*Id.* at 39. "Unlike land or equity which have an indeterminate life," Commerce continues, "physical assets have a useful life which can serve as a reasonable measure of the duration of benefits provided to a firm from nonrecurring subsidies." *Id.*

Commerce considered alternative methodologies proposed by the parties, but in the end found that "AUL is the most reasonable method of deriving the allocation period for nonrecurring subsidies; it reasonably reflects the commercial and competitive advantages enjoyed by the firms under investigation." *Id.* at 20. "[T]he AUL of the renewable physical assets employed by a company provides a reasonable approximation of the duration of the commercial and competitive benefits to that company for all non-recurring subsidies," Commerce reasons, as subsidy "benefits extend as long as the average useful life of the company's assets." *Id.* at 7.[7]

---

7. Commerce cites the General Agreement on

Tariffs and Trade (GATT) guidelines, which pro-

### 2. Company–Specific AUL Calculations

After determining AUL was the most reasonable methodology for deriving an allocation period, Commerce applied the methodology to the companies under investigation to derive a company-specific AUL for each respondent. To make the company-specific AUL calculations, Commerce requested that Usinor Sacilor, Sollac, and GTS (collectively "Usinor Sacilor"), respondents in the *French Final Determination,* and British Steel plc (BS plc), a respondent in the *British Final Determination,* provide the AUL of their assets as well as "any national standards concerning the average useful life of assets in France and in the United Kingdom." *Id.* at 17. Both Usinor Sacilor and BS plc provided AUL calculations based on the depreciation and fixed assets values as reported in their respective financial statements.

Commerce describes its calculation of company-specific AUL as follows. First, Commerce observes that although it preferred *actual* company-specific AUL as calculated from company asset ledgers, both BS plc and Usinor Sacilor informed Commerce that actual AUL information was unavailable. The companies instead submitted AUL calculations based on their financial statements, the data from which, Commerce determined, "provide a reasonable basis for approximating [AUL] for purposes of this redetermination." *Id.* at 46. Second, Commerce explains,

> [w]hen calculating annual depreciation, an asset's gross book value is multiplied by a rate derived using the asset's expected useful life. We reviewed the companies' financial statements and determined that, by reversing this calculation and dividing the gross book value of assets by depreciation expense, a reasonable estimate of average useful life is obtained.

*Id.* (footnote omitted). The foundation for this calculation, Commerce continues, is twofold. First, "the rate at which the assets are depreciated for these two companies is based

on the average useful lives of assets." *Id.* Second, the cumulation of the assets and of related depreciation expense over several periods "serves to mitigate any distorting influence caused by additional depreciation or writebacks of earlier charges." *Id.* As the third step in the company-specific AUL calculations, Commerce "added depreciation charges for several years, and divided by the sum of average gross book value of depreciable fixed assets for the related periods." *Id.* at 46–47.

#### a. French Final Determination

Usinor Sacilor provided Commerce with AUL calculations based on the company's financial statements during the period 1978 through 1991. To compute Usinor Sacilor's AUL calculation, Commerce summed depreciation charges for several years and divided by the sum of average gross book value of depreciable fixed assets for the related periods. Where detail of fixed assets was provided, land, construction-in-progress, and pre-payments to suppliers of property were not included in the calculation of gross book value. Commerce concluded "Usinor Sacilor's AUL calculation using gross book value of plant and equipment results in an average AUL of 14 years." *Id.* at 19. Accordingly, Commerce allocated the benefits from nonrecurring subsidies provided to Usinor Sacilor over 14 years.

#### b. British Final Determination

In response to Commerce's request for the AUL of company assets, BS plc stated the estimated service life of each of its assets was recorded on individual asset registers, and that it maintained over 50,000 separate asset accounts. The company reported it has never calculated a weighted average service life for these assets. Therefore, BS plc did not calculate an AUL from its asset register, Commerce found, but instead submitted an AUL calculation based on depreciation and asset values as reported in its financial statements. BS plc's AUL calculations used a nine-year period—from 1978 through 1986—

---

vide that the allocation period over which to allocate subsidy benefits "should be based on reasonable and generally accepted financial and accounting principles such as the average life of assets owned by the firm." *Allocation Remand*

at 6 (citing *Guidelines on Amortization and Depreciation,* GATT Doc. SCM/64 (Apr. 25, 1985), *reprinted in Basic Instruments and Selected Documents* 154 (32nd Supp.1986)).

and were derived by dividing net book values of land, buildings, plant and machinery at the beginning of the year by depreciation for that year. Commerce, however, rejected BS plc's use of net book value and recalculated the company's AUL using gross book value, arriving at an average AUL of 18 years.[8] Accordingly, Commerce allocated the benefits from nonrecurring subsidies provided to the company over 18 years.

### Contentions of the Parties

#### A. *Foreign Producers*

Plaintiffs contend Commerce's AUL allocation methodology fails to reasonably reflect the commercial and competitive benefit of nonrecurring subsidies and therefore should be abandoned in favor of an alternative methodology—the long-term debt methodology. (Comments of Usinor Sacilor on Commerce's Remand Redetermination on the General Issue of Allocation (Usinor Sacilor's Comments) at 5, 18.)[9] Usinor Sacilor argues Commerce's explanation that " '[a] company's renewable physical assets are reasonably related to the productive activity of a firm in that the renewable physical assets are absolutely essential to production,' " (*id.* at 8 (quoting *Allocation Remand* at 7)), "offers up nothing more than a warmed-over, slightly lengthier version of the 'life cycle' theory, which the Court has already rejected [in *British Steel* ]," (*id.*). Although physical assets are unquestionably related to a company's production activities, Usinor Sacilor contends,

> there is absolutely *no* basis for concluding that the useful lives of these particular assets are therefore a reasonable measure of the duration of the commercial and competitive benefit to a company resulting from an infusion of subsidy funds, in light of the court's recognition ... that subsidies benefit the firm as a whole, not just physical assets.

(*Id.* at 8–9 (footnote omitted).)

Usinor Sacilor also argues the fact that "there is no way to precisely measure the duration of a subsidy benefit" does not give Commerce free rein "to adopt an arbitrary but administratively convenient practice in the exercise of its discretionary authority." (*Id.* at 10 (footnote omitted).) Commerce has conceded the arbitrariness of the AUL methodology, Usinor Sacilor charges, and cannot rely on agency experience as a basis for the methodology when in fact the rationale was "lifted directly from the Domestic Producers." (*Id.* at 12 (footnote omitted).) Usinor Sacilor insists Commerce has failed again to "substantiate a conceptual or factual link between an industry's 'life cycle' or 'production' and AUL that would justify concluding that the latter is reasonably related to the commercial and competitive benefit to the firm." (*Id.* at 13.)

The premise behind the long-term debt methodology [10] proposed by Usinor Sacilor is that "it is the receipt of money on terms inconsistent with commercial considerations, not the purchase of equipment or anything else" that constitutes the subsidy benefit. (*Id.* at 14.) Commerce has long recognized the financial nature of subsidy benefits, Usinor Sacilor contends, and the Court itself "has elucidated the financial nature of subsidy benefits." (*Id.* at 15.) In light of the above, Usinor Sacilor urges the Court to direct Commerce to abandon the AUL allocation methodology and adopt the long-term debt methodology.

BS plc adds the argument that Commerce's analysis of the relationship between assets and the duration of subsidy benefits is

---

**8.** Commerce explained that gross book value is a more appropriate method for calculating AUL when using depreciation figures, because it "results in a figure that better reflects the total average useful life of the assets, whereas using net book value results in a calculation of the average *remaining* life of assets." *Allocation Remand* at 19–20.

**9.** BS plc filed comments to the *Allocation Remand,* which "adopt[] the arguments in the Usi- nor Sacilor submission by reference." (Comments of BS plc on the Final Results of the Remand Determination: Allocation (BS plc's Comments) at 1 n. 1.)

**10.** The long-term debt methodology advocated by Usinor Sacilor would use the duration of a company's long-term debt—as measured by the average long-term debt maturity prevailing in the year of receipt of the subsidy—to determine the allocation period. *See Allocation Remand* at 8–9.

based on a logical fallacy.[11] BS plc argues "simply because subsidies and physical assets are both related to production, it does not follow that subsidies are logically related to physical assets or the useful lives of those assets." (BS plc's Comments at 8 (footnote omitted).) BS plc also rejects Commerce's premise that capital equipment and machines "have an identity which cannot be separated from the firm. . . . [T]hey comprise the core elements of a company's productive activities. . . ." (*Allocation Remand* at 39, *quoted in* BS plc's Comments at 9.) Commerce has cited no authority for such a proposition, BS plc contends, and has failed to explain why the useful lives of equipment and machines is of greater relevance than any other factors of production—including employees, patents, licenses, and leased land and buildings—all of which have definitive and measurable lives. (BS plc's Comments at 10.)

BS plc also alleges Commerce's company-specific AUL calculations produce amortization periods that vary widely. This underscores that AUL calculations have "little if anything to do with the actual average useful life of a steel producer's assets," BS plc argues. (*Id.* at 16.) Such a methodology is essentially arbitrary, BS plc charges, and is "not a sound basis upon which to administer U.S. CVD laws." (*Id.*) BS plc supports the alternative allocation methodologies proposed by Usinor Sacilor, and argues "[w]hile these alternatives are not a perfect measure of the likely duration of subsidy benefits, they are decidedly less arbitrary and more relevant than the methodology chosen by the Department." (*Id.* at 17.)

### B. *Department of Commerce*

Commerce disputes Usinor Sacilor's claim that in *British Steel*, the Court rejected the general concept of AUL and determined AUL had no logical relationship to the commercial and competitive benefits enjoyed by a subsidy recipient. (Def.'s Resp. to Comments on the Remand Determination on the General Issue of Allocation at 4.) Instead, Commerce argues, the Court merely requested an explanation "of how the allocation methodology reflects the commercial and competitive benefit to the recipient of nonrecurring subsidies." (*Id.* at 5.)

Commerce refutes BS plc's claim that the AUL methodology is tainted by a logical fallacy. Commerce argues it did not conclude that "all subsidy benefits relate to the lives of physical assets," but only that "the lives of physical assets are reasonably related to the benefits from nonrecurring subsidies." (*Id.* at 7 n. 4.)

Plaintiffs are also wrong, Commerce contends, when they argue Commerce skewed its analysis toward equipment and machines and away from other productive resources. Commerce argues it did recognize there are factors other than physical assets that relate to a company's productive activity, but that the agency properly drew a critical distinction between physical assets, which have a useful life, and other corporate elements such as land or equity, which have an indeterminate life. It is "[t]his distinction between core elements and non-core elements of a firm's productive activities," Commerce continues, which is the essential element of the AUL methodology. (*Id.* at 9.)

Commerce responds to BS plc's complaint that the agency's method of calculating company-specific AUL leads to variable results by pointing out that "the use of this method was dictated, in large part, by the information provided by the parties during the remand proceeding. Commerce requested actual AUL information and the parties were unable to provide it." (*Id.* at 17.) Furthermore, Commerce points out that company-specific calculations, by their nature, will produce variable results as different companies

11. BS plc contends the logical construct underpinning Commerce's AUL methodology is as follows: "(1) All subsidy benefits relate to production. (2) All physical assets relate to production. (3) Therefore, all subsidy benefits relate to the lives of physical assets." (BS plc's Comments at 5 (footnote omitted).) Such an argument, BS plc asserts, succumbs to the logical fallacy known as the " 'fallacy of the undistributed middle,' " which states "that because two events or objects have a common characteristic, these events or objects must themselves have a relationship to one another, when in fact they may have no relationship whatsoever." (*Id.* at 6 (citation omitted).)

have different replacement schedules for fixed assets.

With respect to plaintiffs' proposed long-term debt methodology as an alternative to the AUL methodology, Commerce contends such an approach "is based upon arbitrary assumptions and leads to anomalous results." (*Id.* at 10.) Focusing on the hypothetical cost of alternative financing as a basis for determining the allocation period is misguided, Commerce argues, because the focus of CVD law is the benefit to *production.* Additionally, Commerce posits that a debt-based methodology would be subject to some of the same drawbacks that plaintiffs allege infect the AUL methodology—variable results depending on the years and the individual companies examined.

### C. *Domestic Producers*

Plaintiffs' criticisms of the AUL methodology are unfounded, Domestic Producers argue, as "AUL represents a meaningful approximation of the period over which subsidies benefit the recipient, regardless of use." (Reply Comments of Def.–Intervenors AK Steel Corp., *et al.*, Regarding Allocation (Domestic Producers' Rebuttal Comments) at 9.) Domestic Producers concede that subsidies may be used for purposes other than the purchase of physical assets, but stress there is "no economic or accounting theory that will allow the determination of the period over which subsidies used for these purposes provide benefits." (*Id.,* "Summary of Argument" at 1.) Domestic Producers dispute BS plc's claim that Commerce's methodology is logically flawed. Commerce's conclusion that the AUL of physical assets is reasonably related to production, Domestic Producers continue, "does not mean that all subsidies must relate to physical assets or that benefits definitively last as long as assets; it means only that the AUL of physical assets is a meaningful measure of the benefits from subsidies." (*Id.* at 11 (footnote omitted).) [12]

Domestic Producers upbraid plaintiffs for failing to discuss precedent, where, according to Domestic Producers, the Court upheld an allocation methodology that was the same as that employed by Commerce in the *Allocation Remand. See Ipsco, Inc. v. United States,* 13 CIT 335, 710 F.Supp. 1581 (1989) (*Ipsco III*), *rev'd in part on other grounds,* 8 Fed.Cir. (T) 80, 899 F.2d 1192 (1990). Accordingly, Domestic Producers contend the Court should reach the same conclusion it did in *Ipsco III* and hold Commerce's "use of a company-specific AUL is a reasonable method for determining the allocation period for subsidies." (*Id.* at 17.)

The long-term debt methodology proposed by plaintiffs is not a reasonable method of determining the allocation period, Domestic Producers argue, because the duration of existing long-term debt bears no relationship to the duration of subsidy benefits. Domestic Producers insist Commerce has already provided a detailed explanation in the *Allocation Remand* why such a methodology is lacking, which explanation plaintiffs have failed to rebut. Accordingly, although such a showing is not necessary under the law, Domestic Producers assert Commerce's AUL methodology is superior to that recommended by plaintiffs.

### DISCUSSION

This Court did not, contrary to plaintiffs' contentions, reject the AUL methodology in *British Steel.* In that decision, the Court held Commerce failed to allocate the benefits from nonrecurring subsidies in a manner reflecting the actual "commercial and competitive benefit" of the subsidies, and held Commerce's use of a 15–year allocation period based solely on the IRS tax tables was not based on substantial evidence and was not otherwise in accordance with law. *See British Steel,* 879 F.Supp. at 1298. Accordingly, the Court found the allocation methodology as set forth in the *General Issues Appendix* was unlawful as applied, but rendered no finding on the AUL methodology itself.

---

**12.** Domestic Producers deride BS plc's critique that Commerce's methodology yields varying results for different companies in different years given that Commerce's original methodology did provide uniformity and predictability, but nevertheless was opposed by plaintiffs in *British Steel.* (Domestic Producers' Rebuttal Comments at 13 (footnotes omitted).)

■ Because the CVD statute does not provide for a method of allocating the benefits bestowed by nonrecurring subsidies, the method chosen by Commerce need only be "based on a permissible construction of the statute," *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984), and must not "contravene or ignore the intent of the legislature or the guiding purpose of the statute." *Ceramica Regiomontana*, 10 CIT at 405, 636 F.Supp. at 966 (citing *Chevron*, 467 U.S. at 843–44, 104 S.Ct. at 2781–83) (further citation omitted). As expressed in the legislative history to the Trade Act of 1979, Commerce is charged with deriving "[r]easonable methods of allocating the value of such [nonrecurring] subsidies over the production or exportation of the products benefiting from the subsidy." S.Rep. No. 249, 96th Cong., 1st Sess. 85 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 471. Additionally, "a reasonable period based on the commercial and competitive benefit to the recipient as a result of the subsidy must be used." *Id.* at 85–86, *reprinted in* 1979 U.S.C.C.A.N. at 471–72. The Court finds Commerce has set forth a reasonable explication of how allocating the benefits of nonrecurring subsidies using the AUL of certain physical assets reflects the commercial and competitive benefit of the subsidies to the companies.

The Court recognizes there appears to be no economic or accounting theory that would permit an actual determination of the precise period over which subsidies benefit a company. This should not be surprising given the impracticality of tracing subsidies to individual assets and the futility of monitoring those assets to determine how long they benefit from such subsidies. Faced with this difficulty, but mindful of the Court's instructions to allocate subsidy benefits in a manner re-flecting their commercial and competitive benefit to the company, Commerce chose the AUL methodology using company-specific AUL calculations as a reasonable surrogate for determining the actual duration of benefits flowing from subsidies.

The Court does not quarrel with Commerce's reasoning that the CVD statute focuses in part on production in identifying those subsidies that are countervailable. The statute defines "subsidy," in part, as a bounty or grant "paid or bestowed directly or indirectly on the manufacture, *production*, or export of any class or kind of merchandise." 19 U.S.C. § 1677(5)(A)(ii) (1988) [13] (emphasis added); *see also* 19 U.S.C. § 1303(a)(1) (1988) (providing that a duty equal to the net amount of a bounty or grant shall be paid on "any bounty or grant upon the manufacture or production or export" of the subject merchandise). As plaintiffs correctly point out, there are other company resources that play a role in the production of merchandise beyond the renewable physical assets that Commerce examined in its AUL methodology. Commerce's focus on renewable physical assets does not necessarily mean, however, that Commerce considers renewable physical assets to be the *only* company resources that aid production. Commerce, in its discretion, chose to examine the determinable life of renewable physical assets and provided a reasoned explanation for doing so. If Commerce were compelled to consider only those corporate resources that actually benefited from subsidies, the agency would face an impractical and impossible task. In short, the AUL methodology using company-specific calculations is a reasonable method of allocating the commercial and competitive benefit of subsidy benefits.[14]

■ The Court is not persuaded by any of plaintiffs' arguments attacking the reason-

<hr>

13. The Uruguay Round Agreements Act, Pub.L. No. 103–465, 108 Stat. 4809 (1994), amended the CVD statute in several respects. Because Commerce's investigation in this case took place before the effective date of the amendments, all references to the CVD statute in this opinion are to the 1988 version.

14. The Court notes that when a GATT committee considered how countervailable subsides should be allocated over time, the committee determined that allocating a grant subsidy "over the average life of renewable physical assets is one generally practical, fair, and consistent method of allocation." *Guidelines on Amortization and Depreciation*, GATT Doc. SCM/64, *reprinted in Basic Instruments and Selected Documents* at 155–56.

ableness of the AUL methodology. For example, plaintiffs' contend the AUL methodology appears to have been advanced first by Domestic Producers. This claim, even if true, is irrelevant. The Court will not require that Commerce's methodologies be drawn solely from the font of agency wisdom. It is proper for Commerce to base its methodologies on numerous sources including statutory directives, internal agency analysis, and party comments.

BS plc's complaint that the AUL methodology yields variable results that undermine the reliability of the methodology is not convincing. It is reasonable to expect that once Commerce examines the commercial and competitive benefit of nonrecurring subsidies on a firm by firm basis there will be differences in results in light of the unique economic circumstances of each firm. The variations in company-specific AUL calculations are not indicative of a weakness in the methodology, but rather reveal the differences in financial data and depreciation methods of each company.

To its credit, Commerce devoted considerable resources weighing alternative allocation methodologies proposed by plaintiffs. *See Allocation Remand* at 8–16; 22–29. The Court need not review the alternative methodologies nor Commerce's reasons for rejecting them in favor of the AUL methodology. *See Wheatland Tube Corp. v. United States,* 17 CIT 1230, 1245, 841 F.Supp. 1222, 1234 (1993) ("Commerce has broad discretion to choose a methodology to satisfy the statutory mandate.") It is sufficient to say Commerce has provided a persuasive rejection of alternative allocation methodologies.

The Court also notes Commerce's AUL methodology is strikingly similar to a methodology upheld by the CIT in *Ipsco III* and affirmed by the Court of Appeals for the Federal Circuit (CAFC). In *Ipsco III,* the allocation methodology reviewed was based on "data taken from Ipsco's 1984 Annual Report" that allowed Commerce to calculate the average depreciation period by subtracting from the total value of Ipsco's replaceable physical assets the value of construction in progress and then dividing this result by the net depreciation charged during the year. *Ipsco III,* 13 CIT at 335–36, 710 F.Supp. at 1582 (citation omitted). This is similar to Commerce's methodology in the *Allocation Remand* where the agency divided the gross book value of assets by depreciation expense to obtain a reasonable estimate of a company-specific AUL. *See supra* at 433 (explaining how Commerce calculated company-specific AUL in the *Allocation Remand*). The CIT in *Ipsco III* upheld Commerce's "allocation of the subsidy to a period representing the average depreciable life of all of Ipsco's replaceable physical assets" even though the Court recognized "this may not be a totally logical approach to grant valuation." *Ipsco III,* 13 CIT at 337, 710 F.Supp. at 1584. On appeal, the CAFC affirmed, finding Commerce's allocation methodology unobjectionable. *Ipsco, Inc. v. United States,* 8 Fed.Cir. (T) 80, 88, 899 F.2d 1192, 1198 (1990).

In conclusion, the Court finds Commerce's *Allocation Remand Allocation Remand* setting forth a method of determining the allocation period over which to allocate the benefits of nonrecurring subsidies using the company-specific average useful life of renewable physical assets is sustained as based on substantial evidence and otherwise in accordance with law.

### Section Two: Sales Denominator

On the general issue of the sales denominator, plaintiffs filed a joint motion for partial judgment on the agency record pursuant to U.S. CIT R. 56.2 and for an order declaring that aspect of the *General Issues Appendix* pertaining to the appropriate sales denominator employed by Commerce as set forth in the *General Issues Appendix,* 58 Fed.Reg. at 37,231–36, and applied in the *French Final Determination* and the *British Final Determination* to be unsupported by substantial evidence on the record and not otherwise in accordance with law. AK Steel Corporation,[15] Bethlehem Steel Corporation,

15. At the time of the filing of Domestic Producers' original motion for judgment upon the agency record on the general issue of sales denominator, AK Steel Corporation was named Armco Steel Company, L.P.

Geneva Steel, Gulf States Steel Incorporated of Alabama, Inland Steel Industries, Incorporated, Laclede Steel Company, LTV Steel Company, Incorporated, Lukens Steel Company, National Steel Corporation, Sharon Steel Corporation, U.S. Steel Group a unit of USX Corporation, and WCI Steel, Incorporated (collectively "Domestic Producers") opposed plaintiffs' motion.

In *British Steel,* regarding the general issue of the sales denominator, this Court held: (1) Commerce did not permit plaintiffs a reasonable opportunity to be heard on the issue of Commerce's adoption of the presumption that subsidies are tied to domestic production for companies with multinational production in Commerce's determination of the appropriate sales denominator; and (2) Commerce did not provide plaintiffs an adequate opportunity to submit evidence to rebut the presumption erected by Commerce in its determination of the appropriate sales denominator. *British Steel,* 879 F.Supp. at 1319. Accordingly, the Court issued a remand on the general issue of the sales denominator.

This part of the opinion addresses Commerce's *Final Results of Redetermination Pursuant to Court Remand on General Issue of Sales Denominator* (dated June 23, 1995) (*Sales Denominator Remand* ).

## Background

### A. *The Tying Presumption*

As the Court explained in *British Steel,* Commerce divides the net countervailable benefit allocable to the period of investigation (POI) by the company's sales of benefitting merchandise during the POI.

> If the subsidy at issue is deemed tied to domestic production, Commerce allocates the benefit of the subsidy fully to the sales of domestically produced merchandise and uses domestic sales as the denominator. If the subsidy is deemed untied, however, Commerce allocates the benefit of the sub-

sidy to total worldwide sales and uses worldwide sales as the denominator. *British Steel,* 879 F.Supp. at 1310 (citing *General Issues Appendix,* 58 Fed.Reg. at 37,231).

To determine whether a particular subsidy at issue is tied to domestic production, Commerce begins with the approach it first employed in *Certain Hot Rolled Lead and Bismuth Carbon Steel Products from France,* 58 Fed.Reg. 6221 (Dep't Comm.1993) (final determ.) (*France Bismuth* ). Under this approach, the "focus is on resolving the factual question of whether the subsidies at issue are tied to the recipient firm's production of merchandise domestically in the country under investigation or, alternatively, untied." *Id.* at 1311 (quotations and citation omitted).[16] In the *French Final Determination* and the *British Final Determination,* Commerce modified the sales denominator analysis it employed in *France Bismuth* by erecting a rebuttable presumption to decide the factual question of tying. As explained by Commerce,

> [U]nder the Department's refined "tied" analysis, the Department will begin by presuming that a subsidy provided by the government of the country under investigation is tied to domestic production. However, this presumption is not irrebuttable. A party may rebut this presumption by presenting evidence tending to show that the subsidy was not tied to domestic production.

*General Issues Appendix,* 58 Fed.Reg. at 37,231, *quoted in British Steel,* 879 F.Supp. at 1311.

To rebut the presumption that subsidies are tied to domestic production, Commerce declared,

> [r]elevant evidence may include the nature of the program at issue, whether the subsidy was bestowed specifically to provide other than a domestic benefit, communications between the government and the respondent relating to the subsidy provided pursuant to the program at issue, the gov-

---

**16.** *France Bismuth* marked the first time Commerce decided the appropriate sales denominator where a respondent's total sales included not only sales of domestically produced merchan-

dise, but also sales of merchandise produced in one or more other countries. *British Steel,* 879 F.Supp. at 1311 (citing *General Issues Appendix,* 58 Fed.Reg. at 37,231).

ernment's ownership interest, if any, in the respondent, and any other evidence addressing the likely beneficiaries of the subsidy. . . . [T]he above list of evidentiary criteria is not exhaustive, nor can any one or several of these factors necessarily give decisive guidance in all cases.

*Id., quoted in British Steel,* 879 F.Supp. at 1311.

### B. *The Court's Remand Instructions to Commerce*

In remanding the *French Final Determination,* insofar as that determination pertained to Commerce's application of the sales denominator methodology, this Court ordered Commerce to give interested parties notice and the opportunity to comment on the agency's adoption of the tying presumption. If, after consideration of such comments Commerce determined the tying presumption was an appropriate means to calculate the sales denominator, the Court ordered Commerce to give interested parties notice and the opportunity to submit evidence on the record for the purpose of rebutting the tying presumption after which Commerce was directed to examine the submitted evidence to determine whether it was sufficient to rebut the tying presumption. If Commerce found the evidence submitted sufficient to rebut the tying presumption, the Court directed Commerce to make all necessary and appropriate findings and calculations. *See British Steel,* 879 F.Supp. at 1330.

In remanding the *British Final Determination,* insofar as that determination pertained to Commerce's application of the sales denominator methodology, this Court ordered that if Commerce should find in its remand determination on the general issue of privatization that any party was liable for countervailing duties, Commerce was directed to give interested parties against whom countervailing duties had been assessed notice and the opportunity to comment on the agency's adoption of the tying presumption. If, after consideration of such comments Commerce determined the tying presumption was an appropriate means to calculate the sales denominator, the Court ordered Commerce to give interested parties notice

and the opportunity to submit evidence on the record for the purpose of rebutting the tying presumption after which Commerce was directed to examine the submitted evidence to determine whether it was sufficient to rebut the tying presumption. If Commerce found the evidence submitted sufficient to rebut the tying presumption, the Court directed Commerce to make all necessary and appropriate findings and calculations. If Commerce were to find in its remand determination of the *British Final Determination* on the general issue of privatization that no parties were liable for countervailing duties, the agency need not revisit the general issue of the sales denominator as it related to the *British Final Determination.*

### C. *Sales Denominator Remand*

#### 1. Basis for the Tying Presumption

Commerce explains the tying presumption satisfies the two standards governing an agency's use of a presumption; first, the presumption is consistent with the intent of the CVD statute; and second, there is some rational connection between the facts proved and the facts presumed. *Sales Denominator Remand* at 8, 13–14. The tying presumption comports with the first standard, consistency with the CVD statute, Commerce asserts, because

[i]t reasonably strives to measure subsidies benefitting the merchandise under investigation accurately, as it "allocates fully to the products actually being investigated any subsidies directly tied to them," Appendix 2 of *Final Affirmative Countervailing Duty Determinations; Certain Steel Products from Belgium,* 47 Fed.Reg. 39316, 39320 (Sept. 7, 1982), and avoids "having to dilute benefits . . . that we know are tied to products under investigation," *Final Results of Countervailing Duty Administrative Review; Industrial Nitrocellulose from France,* 52 Fed.Reg. 833, 835 (Jan. 9, 1987).

*Id.* at 8 (citation omitted).

As to the second standard—a rational connection between the facts proved and the

facts presumed—Commerce first references *British Steel* where the agency argued

> the Department can reasonably conclude that a government normally would provide a subsidy to a firm with multinational production for domestic purposes. [Commerce] added that the obvious corollary to this view of government subsidization is that the government normally will not provide subsidies to firms that refuse to use them in the way that the government wants, and firms receiving subsidies normally will not use them in a way that would contravene the government's purposes, as they otherwise would risk losing future subsidies.

*Id.* at 9. Commerce buttresses this observation by stating that a careful review of the various materials cited by the respondents does "not detract from the soundness of the Department's conclusion that governments normally will provide subsidies to firms with multinational production with the intent and desire that the firms use those subsidies domestically." *Id.* at 10. After discussing certain economic texts cited by respondents, including one source suggesting multinational firms will pursue direct foreign investment as part of their profit-maximizing behavior, Commerce concludes:

> Overall, while the evidence submitted by the respondents illustrates certain instances where a government might allow a company it owns to expand overseas, the evidence does not warrant a different conclusion from that reached by the Department based on its experience in this area. Accordingly, the Department continues to conclude that there is a rational connection between the facts proved, *i.e.,* that the government of the country under investigation has provided a subsidy to a firm with multinational production, and the facts presumed, *i.e.,* that the subsidy is tied to the firm's domestic production.

*Id.* at 13–14.

Commerce also notes that a reviewing court may look to the usefulness of a presumption when assessing its validity and adds that it is not unusual for Commerce to use presumptions, several of which have been upheld by the courts. For all of the forego-ing reasons, Commerce adopts its tying presumption again in the remand proceeding.

### 2. Rebuttal Evidence Under the Tying Presumption

Commerce describes the various types of rebuttal evidence that may be probative in rebutting the tying presumption. *See id.* at 3–4 (quoting *General Issues Appendix,* 58 Fed.Reg. at 37,231). The types of evidence are: (1) the nature of the program at issue; (2) whether the subsidy was bestowed specifically to provide other than a domestic benefit; (3) communications between the government and respondent relating to the subsidy provided pursuant to the program at issue; (4) the government's ownership interest in the respondent; and (5) any other evidence addressing the likely beneficiaries of the subsidy. *Id.* at 3 (quoting *General Issues Appendix,* 58 Fed.Reg. at 37,231).

Before considering the rebuttal evidence submitted by the parties in the *French Final Determination* and the *British Final Determination,* Commerce sets forth several general principles to guide its analysis of the evidence. First, the tying presumption

> is rebutted once a party . . . presents evidence "tending to show" that the subsidies at issue are not tied to domestic production. For this purpose, the party must present enough evidence so that a reasonable fact-finder could be convinced of the non-existence of the presumed fact. . . . There must be presented, in other words, sufficient evidence to raise a genuine issue of fact as to whether the subsidies at issue are tied to the recipient firm's domestic production.

*Id.* at 15–16. Second, Commerce examines each subsidy at issue separately to determine if a party has rebutted the tying presumption. Accordingly, Commerce declares that if it were to find that a grant was untied in one year, this "would not mean that grants to that company in other years, even under the same subsidy program, were necessarily untied." *Id.* at 16. The third principle Commerce enunciates is that in the event the presumption is rebutted, Commerce evaluates "all of the record evidence, without the aid of any presumption, [to] decide whether

or not the subsidies at issue are, in fact, tied or untied." *Id.*[17] Finally, Commerce does "not consider any evidence of subsequent events intended to demonstrate the actual effects or uses of the subsidies at issue." *Id.* at 17 (emphasis omitted).

### 3. Application of the Tying Presumption to the Record Evidence

#### a. French Final Determination

Commerce explains Usinor Sacilor, the French respondent, advanced evidence and argument to rebut the tying presumption for subsidies provided pursuant to two of the ten programs determined to provide countervailable benefits in the *French Final Determination:* (1) the conversion of debt instruments—"prêts à caractéristiques spéciales" (PACS) or "loans with special characteristics" and "Fonds d'Intervention Siderurgique" (FIS) or "Steel Intervention Fund" bonds—into equity in 1981, 1986, and 1988[18]; and (2) grants given in the form of shareholders' advances from 1982 through 1986. *Id.* at 17.

Commerce made the following findings regarding the conversion of debt instruments. In 1978, with the French steel industry approaching insolvency, the government of France (GOF) asked the French steel companies and their creditors to restructure the French steel industry. The ensuing restructuring plan required substantial government subsidies, consolidation of the steel companies' debt, reduction of debt service charges, and the conversion of long-term debt into PACS. Despite these efforts, the steel industry continued to suffer from severe losses. In response, the GOF announced the 1982 Plan Acier. This plan sought to re-establish a sound financial structure for the French steel industry by reducing its financial expenses to a level comparable to that of its principal competitors, and sought to modernize production facilities in France through an investment plan calling for the infusion of FF 17.5 billion over the five-year period, 1982–1986. However, because of unrealistic estimates of demand and production, the 1982 Plan Acier was changed and a revised plan was adopted in March 1984. The revised plan resulted in massive subsidies and a major restructuring of the French steel industry in 1986.

Commerce determined "it is clear that each of these steel plans focused on improving the financial structure of the French steel industry and modernizing and expanding its facilities in France," however, "[t]here was not the slightest intimation in these plans that the monies given to Usinor Sacilor . . . were intended for foreign operations." *Id.* at 19. To explain this finding, Commerce first summarizes the arguments put forth by Usinor Sacilor.

> Usinor Sacilor argues that the French government initiated the debt conversions in 1981, 1986 and 1988 in order to benefit Usinor Sacilor's world-wide operations. As Usinor Sacilor explains, the French government gave these subsidies to Usinor Sacilor, which is the parent company of numerous domestic and foreign subsidiaries and which, for accounting purposes, keeps consolidated books incorporating its subsidiaries' financial data. According to Usinor Sacilor, the subsidies had significant effects on the overall capital structure of Usinor Sacilor, as they allowed Usinor Sacilor to cover massive consolidated losses, to provide operating capital for consolidated operations and to finance investment.
>
> . . . .

---

**17.** As stated by Commerce, the tying presumption provides an "analytical aid for evaluating evidence and making factual determinations." *Sales Denominator Remand* at 48. When seen in this light, the tying presumption, when not rebutted, would appear to lessen Commerce's factfinding burden in tying investigations. If the presumption is rebutted, however, Commerce correctly states it reviews all the record evidence, without the aid of any presumption, to make a factual determination whether the subsidies at issue are tied or untied.

**18.** In *Inland Steel Industries, Inc.,* et al. *v. United States,* Consol. Court No. 93–09–00567–CVD, the France country-specific proceeding, Usinor Sacilor challenges Commerce's determination that PACS and FIS bonds were debt instruments. In light of the scheduling order governing these proceedings, it is not appropriate for the Court to decide this issue in this opinion.

Usinor Sacilor also points out that, for the years relevant to the 1981, 1986 and 1988 debt conversions, Usinor Sacilor's consolidated losses totalled FF 72.9 billion. Usinor Sacilor asserts that these losses included losses from not only its domestic subsidiaries, but also its foreign subsidiaries.

*Id.* at 20–21. In Commerce's view, however, the debt conversion subsidies "provided benefits, in the first instance, directly to Usinor Sacilor, not to any of its subsidiaries.... [W]e do not view the accounting transactions undertaken by Usinor Sacilor to eliminate its consolidated losses—as providing the proper focus." *Id.* at 21. Instead, Commerce reasons, "we have focused on the massive debt to equity conversion, specifically, what Usinor Sacilor likely would do with this benefit." *Id.* When seen in this light, Commerce continues,

> Usinor Sacilor has not presented evidence tending to show how or why foreign subsidiaries likely would benefit from the debt conversions in 1981, 1986 or 1988. The record evidence suggests that the subsidizing French government's focus was entirely domestic, and Usinor Sacilor has pointed to no evidence suggesting what Usinor Sacilor likely would do with these subsidies.

*Id.* at 21–22.

As to the shareholders' advances—provided to allow Usinor Sacilor to meet its short-term capital needs during the period 1982–1986—Commerce found there were no official agreements between the GOF and Usinor Sacilor regarding the advances. Instead, Commerce elaborates, Usinor Sacilor presented the company's short-term capital needs to the GOF and the GOF gave Usinor Sacilor monies in the form of shareholders' advances. In light of the characteristics of the shareholders' advances program and in the absence of any evidence further describing the nature of Usinor Sacilor's short-term capital needs, Commerce concludes, "Usinor Sacilor has not presented evidence tending to establish how any foreign subsidiary likely would have benefitted from these shareholders' advances. Consequently, we conclude that Usinor Sacilor has not rebutted the tying presumption here." *Id.* at 24.

Because Usinor Sacilor did not rebut the tying presumption for any of the subsidies at issue, Commerce determined the *ad valorem* subsidy rate in the French investigation would remain the same as that calculated in the *French Final Determination* as amended, and as summarized in the *Final Results of Redetermination Pursuant to Court Remand on General Issue of Privatization* (dated July 17, 1995).

### b. British Final Determination

Commerce states respondent BS plc advanced evidence and argument intended to rebut the tying presumption for subsidies provided by Her Majesty's Government (HMG) in the form of equity infusions made under section 18(1) of the Iron and Steel Acts of 1975 and 1982 (Acts) in fiscal years 1977/78 through 1985/86. Evidence BS plc presented to Commerce included: (1) relevant excerpts from the Acts; (2) corporate plans and budget forecasts submitted by British Steel Corporation (BSC) [19] to HMG; (3) a 1978/79 annual report showing that a non-United Kingdom (UK) subsidiary suffered losses; and (4) affidavits from a BSC officer and supporting documents regarding the 1984 closure of a Canadian operation (Firelake) in which BSC held a substantial interest. After reviewing the evidence, Commerce found BS plc had rebutted the tying presumption only for section 18(1) equity infusions bestowed during fiscal year 1984/85.

Commerce summarized BS plc's evidence and argument concerning the provisions in the Acts as follows: First, the Acts state " 'the Secretary of State may, with approval of the Treasury, pay to the Corporation such sums as he thinks fit.' " *Id.* at 25 (quoting Acts, section 18(1)). Second, the Acts grant BS plc "the authority to operate 'within or outside the United Kingdom.' " *Id.* (quoting Acts, section 2). According to BS plc, these provisions establish BS plc faced no restric-

---

19. BSC was partially privatized in 1988. *See British Steel PLC v. United States,* 924 F.Supp. 139, 182–84 (CIT 1996). Commerce has determined that the post-privatization entity BS plc is the same corporate entity as pre-privatization BS plc, BSC. *See id.* at 184 (citation and footnote omitted). This Court has sustained Commerce's determination. *See id.* at 191.

tions on its use of section 18(1) funds and therefore its ability to use the funds to benefit its foreign operations. Thus, BS plc reasoned, "the lack of restrictions on its use of the funds at issue implies that the government had knowledge that, and acquiesced in the fact that, these funds *may* benefit foreign operations." *Id.*

Commerce was not persuaded by this argument, however, and declares "this evidence, without more, is insufficient to rebut the typing presumption." *Id.* at 26.

> Essentially, this evidence establishes little more than the two facts which originally had to be established for the presumption to be applied, *i.e.,* (1) that the government provided a subsidy to a firm, and (2) that the firm at that time was engaged in multinational production.... [T]he other fact arguably established by BS plc, *i.e.,* that HMG placed no express restrictions on the firm's use of the subsidy funds, adds little. Here, BS plc has not even established, for example, that HMG affirmatively communicated to BSC that it could use the subsidy funds for whatever purpose it desired, without limit, or, as in [*Certain Steel Products from Austria,* 58 Fed.Reg. 37,217 (Dep't Comm.1993) (final determ.) (*Austrian Final Determination* )], that BSC could use the subsidy funds "at home or abroad." Instead, BS plc essentially points to the absence of express restrictions on the firm's use of the subsidy funds in its attempt to rebut the tying presumption.... Indeed, the presumption would be of little utility if the mere absence of express evidence of the government's desires was sufficient to rebut it.

*Id.*

Commerce then examines the budget forecasts for the years 1982/83 and 1983/84, which BS plc submitted on the record to show its capital requirements included "fixed assets abroad." *Id.* at 28. Commerce observes, however, the budget forecasts did not list a separate amount for fixed assets abroad, only an amount for the general category of "other" capital requirements, which included not only fixed assets abroad but also items apparently involving domestic matters. For this reason, "it is impossible to deter-

mine whether BSC ... had capital requirements for fixed assets abroad, or whether the 'other' capital requirements included only one or more of the other listed items." *Id.* Accordingly, Commerce concludes "this evidence is not sufficient to rebut the tying presumption. It provides no specific information regarding the existence of BSC capital requirements associated with fixed assets abroad." *Id.*

Commerce next discusses the 1978/79 British Steel Corporation (International) Ltd. annual report that BS plc provided to show that one of its German subsidiaries suffered losses. Commerce found such evidence wanting: "Beyond showing the existence of these losses, however, BS plc's evidence does not contain anything which would lead us to believe that any subsidy funds received by BSC in fiscal year 1978/79 were likely to be used to offset losses of the German subsidiary." *Id.* at 29. Accordingly, Commerce determined this evidence did not rebut the tying presumption.

Finally, Commerce considers two affidavits from a BSC official addressing the circumstances surrounding the 1984 closure of Firelake, a Canadian iron ore mining operation in which BSC held a 41.7% interest. In 1984, BSC and other shareholders decided to close Firelake for economic reasons. The BSC official present at meetings with HMG recounted discussions of BSC's substantial financial obligations in connection with the Firelake closure, including projected costs of £135 million:

> [G]overnment representatives advised BSC that HMG would approve the provision of £135 million to BSC for the specific purpose of effecting the expenditures in Canada to terminate Firelake's operations. However, government representatives further advised that, as a legal matter, HMG could not authorize the funding of the £135 million pursuant to a funding program separate and apart from that established pursuant to section 18(1). Instead, HMG representatives proposed that the funds so advanced would be made pursuant to section 18(1).

*Id.* (citation omitted). Commerce also notes there is additional record evidence corrobo-

rating the BSC official's affidavit testimony regarding the HMG's approval of funding for the Firelake closure, and concludes,

> we find that BS plc has rebutted the presumption that subsidies provided under section 18(1) for fiscal year 1984/85 were tied to domestic production, given that the evidence would tend to show that the funding benefitted BSC's foreign operations, i.e., Firelake. Absent any contradictory evidence, other than the 1973 and 1978 White Papers,[20] which are relatively more general in nature and removed in time, we also find this evidence sufficient to support a finding that the 1984/85 subsidy funds were untied.

Id. at 31. Accordingly, Commerce declares the *ad valorem* subsidy rate in the *British Final Determination* would be recalculated in the final remand determination on the general issue of privatization. In the *Final Results of Redetermination Pursuant to Court Remand on General Issue of Privatization* (dated July 17, 1995), Commerce calculated a final subsidy rate of 21.30% *ad valorem* (carbon steel plate) for BS plc.

CONTENTIONS OF THE PARTIES

A. *Foreign Producers*

1. The Tying Presumption

Plaintiffs contend Commerce's presumption-based tying methodology is inherently flawed and contrary to law for several reasons. (Pls.' Resp. to the Redetermination Pursuant to Ct. Remand on the General Issue of Denominator (Usinor Sacilor's Comments) at 3.)[21] First, Usinor Sacilor argues the presumption-based methodology ignores the established principle that equity infusions are incapable of being tied because they have an inherent company-wide effect on the finances of the recipient firm. That is, "[j]ust as blood cells transfuse to all parts of the

body, equity flows throughout a company." (*Id.* at 5 (footnote omitted).) Because equity is fungible, flowing throughout the firm, Usinor Sacilor reasons, it is impractical and meaningless to trace equity to its particular uses.

Usinor Sacilor's second argument is that the presumption-based methodology unlawfully relies solely on the theory that governments intend subsidies be used only to benefit domestic production. Usinor Sacilor complains Commerce "has precluded all evidence of 'likely effects' other than the intent of the government ... thus requiring the respondent, in order to rebut the presumption, to specifically disprove [Commerce's] *theory of government intent.*" (*Id.* at 7.) To rely solely on the intent of the subsidizing government, Usinor Sacilor argues, is unlawful as courts have "consistently ruled that what matters with respect to a subsidy is its effect, not the government's intent." (*Id.* (footnote omitted).) Commerce cannot "sidestep legal precedent barring reliance solely on intent by equating intent with 'likely effects,' as it does, *sub silentio*, when it agrees that 'likely effects' are the issue but devises an intent-based methodology." (*Id.* at 8 (citation omitted).)

Third, Usinor Sacilor alleges Commerce has failed to demonstrate a rational connection between the facts found and the facts presumed. Usinor Sacilor claims Commerce's theory that "governments normally provide subsidies for the general purpose of 'promoting the economic and social health of that country and its people,' and for the specific purpose of benefitting *domestic* production," (*id.* at 9 (quoting *Sales Denominator Remand*)), cannot supply the requisite rational connection "because it has no valid foundation.... It is not supported by the agency's administrative experience, and is contradicted by the record evidence," (*id.*).[22]

---

**20.** Various "White Papers" were presented to the UK Parliament annually to obtain approval for section 18(1) and other funding under the Acts. *Sales Denominator Remand* at 26–27.

**21.** BS plc filed comments to the *Sales Denominator Remand,* which "adopt and incorporate by reference the comments by Usinor–Sacilor filed contemporaneously herewith." (Comments of BS plc on the Final Results of the Remand

Review: Denominator (BS plc's Comments) at 1 (footnote omitted).)

**22.** The record evidence contradicting Commerce's theories, Usinor Sacilor explains, includes materials submitted by plaintiffs demonstrating "a flow of funds to the foreign operations of a subsidized [multinational company] is often entirely consistent with achieving the subsidizing government's domestic

Usinor Sacilor's fourth argument against the presumption-based methodology is that it erects an unreasonable requirement that rebuttal evidence must show a parent company receiving the subsidies would likely "pass on" the benefits to the company's foreign subsidiaries. This "passing on" test, Usinor Sacilor claims, is premised on Commerce's "theory that the subsidies provide benefits 'in the first instance' to the parent company receiving them, and not necessarily to its subsidiaries." (*Id.* at 12 (citation omitted).) The "passing on" test is patently unreasonable Usinor Sacilor continues, because it is inconsistent with the fungibility principle that equity infusions are fungible and benefit the entire operations of an enterprise. Furthermore, it engenders a heightened burden of proof requiring evidence that any "secondary" benefits were not tied to domestic production, a burden that was inconsistently applied in the French investigation vis-à-vis the *Austrian Final Determination.*

Finally, Usinor Sacilor asserts that despite the requirement that Commerce base its determination on the entire record, and not select bits of evidence to support its conclusion, Commerce "violated this basic principle of administrative law by establishing two wrongheaded and result-oriented 'general principles' that preclude consideration of significant rebuttal evidence." (*Id.* at 15.) By examining each subsidy separately, Usinor Sacilor claims, Commerce ignores all evidence prior to and subsequent to the specific bestowal at issue thereby divorcing the subsidies from the real-world financial and policy context of their bestowal. Commerce's refusal to examine evidence of corporate behavior or events subsequent to the bestowal of the subsidy, Usinor Sacilor argues, unlawfully limits Commerce's consideration of proba-

tive evidence to only evidence supporting Commerce's conclusion.

BS plc elaborates on Usinor Sacilor's argument sounding in the fungibility of equity infusions: The fungibility principle

> is fundamentally at odds with the notion that *any* subsidy monies from the government can be meaningfully tied to *any* use of funds. Thus, if the government gives monies to a corporation with an explicit directive that those monies be used for a particular purpose, the expenditure of those funds "frees up" monies that the recipient would have spent for that purpose for other uses. In these circumstances, the Department's presumption that funds received from a government can be meaningfully traced to some (*i.e.*, domestic) uses, but not to others (*i.e.*, nondomestic) simply makes no sense.

(BS plc's Comments at 2.) BS plc contends Commerce's responses to this argument in the *Sales Denominator Remand* are not persuasive. (See *id.* at 2–6.)

2. Application of the Tying Presumption to the Record Evidence

   a. French Final Determination

Usinor Sacilor claims it advanced sufficient evidence to rebut the tying presumption. The evidence establishes, Usinor Sacilor argues, the GOF "expressly intended its subsidies to cover the financing needs of Usinor Sacilor's consolidated worldwide operations, and that throughout the period ... it routinely made capital contributions to cover losses and finance operations of [Usinor Sacilor's] foreign subsidiaries." (Usinor Sacilor's Comments at 17–18.) Usinor Sacilor contends Commerce ignored misinterpreted record evidence that the GOF intended to cover Usinor Sacilor's consolidated losses,[23] and ar-

---

goals." (Usinor Sacilor's Comments at 10 (footnote omitted).)

**23.** For example, Usinor Sacilor highlights certain record evidence demonstrating:

· that the principal government intention underlying the steel plans ... was to improve Usinor Sacilor's extremely weak financial condition and to cover the company's massive accumulated consolidated (including *foreign* ) losses.

· that, for example, this GOF intent was expressly communicated in President Mitterand's April 4, 1984 press statement, in which the President specifically referenced loss and production figures corresponding to domestic *and foreign* production....

· that in the 1984 plan, aid ... was committed to the steel companies, of which half ... was initially designated for investment in French facilities, while the remainder was to be used for financing consolidated losses and operations.

gues Commerce "rejected evidence that Usinor Sacilor's foreign operations were a significant source of those losses, and received a significant flow of funds to cover them." (*Id.* at 19 (footnote omitted).) Usinor Sacilor also insists Commerce "ignore[d] critical evidence demonstrating that the 1986 debt-to-equity conversions were likely to be used to cover not only worldwide consolidated losses in 1981–85, but also worldwide losses following the conversion *in 1986*." (*Id.* at 20.) In this vein, Usinor Sacilor charges Commerce "cannot reconcile its wholesale rejection of the French evidence with its acceptance of virtually identical rebuttal evidence provided in the companion [*Austrian Final Determination* ]." (*Id.* at 21 (footnote omitted).)

Usinor Sacilor also complains Commerce has imposed a new rebuttal standard requiring Usinor Sacilor to show " 'how or why foreign subsidiaries would likely benefit' from each bestowal (or how or why an equity infusion would likely be 'passed on' to another part of the consolidated company)—and declares that Usinor Sacilor did not meet it." (*Id.*) Usinor Sacilor protests that Commerce set the burden of producing evidence to rebut the presumption " 'so high that persons in the position of respondents cannot meet it.' " (*Id.* at 21–22 (citations omitted).) Moreover, Usinor Sacilor charges that once "respondents provide sufficient evidence to rebut a presumption, the burden shifts to the agency to come forward with proof that the evidence was 'neither accurate nor sufficient.' " (*Id.* at 22 (quoting *Creswell Trading Co., Inc. v. United States,* 15 F.3d 1054, 1061 (Fed.Cir.1994)).) Commerce has failed to discharge its burden in this case, Usinor Sacilor believes, and accordingly the *Sales Denominator Remand* is unsupported by substantial evidence.

### b. British Final Determination

BS plc maintains that although Commerce did not question the factual accuracy of any of the evidence submitted by BS plc, the agency held that, with one exception, the proffered evidence was insufficient to rebut the presumption. For example, BS plc contends HMG knew the company was expending cash on non-UK activities during the period the company was receiving subsidies and yet HMG did not advise the company that subsidy funds could not be used for that purpose. Commerce did not dispute this assertion, BS plc argues, but nonetheless found the HMG's acquiescence was not enough to rebut the presumption. BS plc disagrees and believes "that the government's acquiescence under the circumstances presented is probative evidence of government intent." (BS plc's Comments at 8.) [24] Finally, BS plc objects to Commerce's finding that the evidence proffered by BS plc concerning the 1984 closure of Firelake "rebutted the domestic use presumption, *but only for subsidy funds received in FY 1984.*" (*Id.* (citation omitted).) BS plc maintains that Commerce should have found the Firelake evidence rebutted the presumption of domestic use for the entire period during which the company received subsidies, and not just a small portion of the period. Otherwise, BS plc pleads, "a respondent would be required to adduce evidence to rebut the domestic tying presumption for each year in which the respondent received subsidies—a burden that is unreasonable by any standard." (*Id.*)

### B. Department of Commerce

### 1. The Tying Presumption

At the outset, Commerce contends plaintiffs' argument that equity infusions are incapable of being tied "is fundamentally defective because it raises an issue that is beyond the scope of the Court's remand instructions." (Def.'s Comments in Opp'n to Usinor Sacilor's & BS plc's Comments on Redetermination Pursuant to Ct. Remand on General Issue of Sales Denominator (Def.'s Rebuttal

(Usinor Sacilor's Comments at 18 (footnotes omitted).)

24. BS plc reasons that if the presumption that governments intend that subsidies be used only for domestic purposes has any factual foundation,

it is reasonable to infer that if a government that is providing subsidies to a domestic company is aware that company funds are being spent for nondomestic purposes, that that government will take affirmative steps to see that no government subsidy monies are used for those purposes.

(BS plc's Comments at 7–8.)

Comments) at 8.) In *British Steel*, Commerce claims, the Court found "Commerce's reasoning in adopting the rebuttable presumption appears 'reasonable on its face,'" (*id.* at 9 (citation omitted)), and only faulted Commerce in failing to afford respondents "'notice and the opportunity to comment on the agency's adoption of the presumption,'" (*id.* at 9–10 (citation omitted)). Accordingly, Commerce explains, the Court limited its remand instructions by requiring Commerce only "to 'give interested parties notice and the opportunity to comment on the agency's adoption of the tying presumption.'" (*Id.* at 10 (citation omitted).) Commerce contends the issue raised by plaintiffs—whether equity infusions must always be considered untied— was neither questioned nor criticized by the Court in *British Steel.*[25]

In response to BS plc's argument that Commerce's tying analysis is inconsistent with the fungibility principle, Commerce reads this argument to be a broad rejection of Commerce's longstanding tying doctrine: "BS plc is arguing flatly that no form of subsidy funds—whether grants, loans or equity infusions—can reasonably be treated as tied." (*Id.* at 13.) First, Commerce responds, this argument suffers from the same fundamental defect as plaintiffs' argument concerning equity infusions in that it exceeds the scope of the Court's remand: "[T]he Court did not instruct Commerce to revisit whether it was even appropriate to use a tying methodology in this case. Rather, the Court only instructed Commerce to reconsider its use of a rebuttable presumption as an aid in making the factual determination of tying." (*Id.*) Second, Commerce maintains BS plc's argument "ignores the basic underlying principle of Commerce's traditional tying analysis, which is that it is appropriate to make exceptions to the fungibility of money principle in certain circumstances." (*Id.* at 13–14 (citation omitted).) Third, Commerce

points out BS plc's argument conflicts squarely with *Usinor Sacilor.*

Commerce rejects plaintiffs' claim that the tying presumption lacks a rational connection between the facts proved—that the government has provided a subsidy to a firm with multinational production—and the facts presumed—that the subsidy is tied to the firm's domestic production. First, Commerce contends it has the requisite expertise regarding governments' rationales for providing subsidies, as demonstrated generally by the agency's broad experience in CVD cases and specifically in several cases involving firms with multinational production. Second, Commerce discusses certain economic texts, which were cited by respondents for the first time during the remand proceedings. Commerce makes reference to its discussion of these materials in the *Sales Denominator Remand* where the agency concluded "they do not detract from the soundness of the Department's conclusion that governments normally will provide subsidies to firms with multinational production with the intent and desire that the firms use those subsidies domestically." (*Sales Denominator Remand* at 10, *cited in* Def.'s Rebuttal Comments at 16 n. 2.)

Commerce objects to plaintiffs' argument that the presumption is unlawful because, they argue, Commerce only will allow evidence of government intent at the time the subsidy is bestowed to rebut the presumption. Plaintiffs are wrong, Commerce counters, because "Commerce plainly allows and considers rebuttal evidence other than evidence of the intent of the subsidizing government." (Def.'s Rebuttal Comments at 18.) It is clear from the *Sales Denominator Remand,* Commerce argues, that the agency considers a variety of rebuttal evidence that goes beyond mere evidence of government intent including "any other relevant evi-

---

**25.** Even if the Court were to revisit this issue, Commerce argues, "the Court squarely addressed the precise argument now raised by plaintiffs, and it just as squarely rejected it" in *Usinor Sacilor v. United States,* 893 F.Supp. 1112 (CIT 1995). (Def.'s Rebuttal Comments at 11.) *Usinor Sacilor,* Commerce explains, "involved essentially the same methodology at issue in this case, namely, a methodology which recognized

that subsidies provided to firms with multinational production could be treated as tied to domestic production, given appropriate facts." (*Id.* at 11 n. 1.) Because the agency's methodology was sustained in *Usinor Sacilor* and plaintiffs have not shown any defects in that holding, Commerce argues, plaintiffs' arguments challenging the tying methodology in this case should be rejected.

dence, without limitation, that a party wants to submit." (*Id.* at 18–19 (citing *Sales Denominator Remand* at 43–45).) Moreover, Commerce points to the *Austrian Final Determination, Usinor Sacilor,* and its investigation of BS plc in this proceeding as instances where in practice Commerce has considered and relied upon evidence other than government intent. More fundamentally, Commerce responds, it is misleading for plaintiffs to suggest it is unlawful for Commerce to rely solely on government intent in the tying context. To the contrary, Commerce explains "in 'those limited circumstances where the effect of a program is not demonstrable,' [Commerce] could 'consider the intent to subsidize to be a surrogate for the effect of a subsidy.'" (*Id.* at 21 (quoting *Industrial Nitrocellulose from France,* 52 Fed.Reg. 833, 835 (Dep't Comm.1987) (final admin. review) (*Industrial Nitrocellulose*)).)

Finally, Commerce argues the general evidentiary principles used by the agency in making its tying determinations are in accordance with law and plaintiffs' arguments to the contrary should be rejected. With regard to Commerce's general principle of analyzing each subsidy at issue separately, Commerce argues that plaintiffs apparently do not disagree with this principle, but rather argue that in applying it Commerce failed to consider evidence preceding and subsequent to the bestowal of the subsidy at issue and only viewed "'an isolated snapshot, taken at the instant of bestowal.'" (*Id.* at 22 (quoting (Usinor Sacilor's Comments at 15).)) Commerce rejects plaintiffs' argument and points to its discussion in the *Sales Denominator Remand* where "Commerce considered all of this pre-bestowal evidence in detail." (*Id.* at 23 (citing *Sales Denominator Remand* at 17–23).)

**26.** The flaw in plaintiffs' reasoning, Commerce argues,

> rests with plaintiffs' misplaced—yet, essential—reliance on the fungibility of money theory. Plaintiffs ignore the fundamental fact that Commerce does not recognize or apply the fungibility of money theory in tying cases.... Instead, Commerce premises its tying analysis, among other things, on the notion that, in the tying context, particular (likely) uses of subsidy funds *can be* identified and attributed to particular products, markets or domestic production.

Commerce next addresses plaintiffs' critique of the general principle that Commerce will not consider evidence of subsequent events intended to demonstrate the actual effects or uses of the subsidies at issue. Commerce responds that notwithstanding the apparent inconsistencies in plaintiffs' arguments on this point, it is "reasonable to consider only evidence of events prior to or at the time of the subsidy bestowal; these events ... show the *likely* effects of a subsidy." (*Id.* at 25.) Quoting from *Usinor Sacilor,* Commerce argues it "will not consider evidence of events 'at any time after the subsidy's bestowal,' as Commerce's tying analysis does 'not ... require Commerce to determine the *actual* effect of a subsidy.'" (*Id.* (quoting *Usinor Sacilor,* 893 F.Supp. at 1141 (further citation omitted)).)[26]

### 2. Application of the Tying Presumption to Record Evidence

#### a. French Final Determination

In response to evidence that Usinor Sacilor claims rebuts the tying presumption as to the 1986 and 1988 debt-to-equity conversions, Commerce argues:

> This presentation ... is not reliable. It includes facts which were not established (such as the allegations that the principal government intent behind the Plan Acier included the covering of foreign losses and that President Mitterand's press statement referred to domestic and foreign production), misleading characterizations of the facts (such as those relating to the losses of Usinor Sacilor's foreign subsidiaries) and facts which relate to subsidies other than the 1986 and 1988 debt-to-equity conversions....

(Def.'s Rebuttal Comments at 25.) Accordingly, it is possible, Commerce reasons, to characterize evidence of events and circumstances occurring *prior* to the receipt and use of subsidy funds as evidence of how a firm *likely* will use those funds, and similarly, to characterize evidence of events and circumstances occurring *after* the recipient has begun to use those subsidy funds as evidence of how a firm *actually* used those funds. When seen in this light, Commerce argues, "plaintiffs' attempt to characterize post-bestowal evidence as evidence of how the firm *likely* will use subsidy funds fails." (*Id.*)

(*Id.* at 26.) Commerce contends it has already answered Usinor Sacilor's argument that the 1986 and 1988 debt-to-equity conversions enabled Usinor Sacilor to eliminate consolidated losses appearing on its consolidated financial statements, and that these consolidated losses represented losses from both domestic and foreign subsidiaries. (*Id.* at 27–28 (discussing *Sales Denominator Remand* at 19–21, 71–72).) "It is not enough that Usinor Sacilor was able to eliminate its consolidated losses," Commerce argues, because

> [b]ased on French accounting principles, it is not at all apparent that if a consolidated company wipes out its consolidated losses, that the losses of its subsidiaries will also be wiped out. There is no right that accrues to the subsidiaries allowing them, in turn, to eliminate their losses. Therefore, the mere fact that Usinor Sacilor could zero out its consolidated losses based on the countervailable subsidies it received from the French government does not in itself rebut the tying presumption.

(*Sales Denominator Remand* at 71–72, *quoted in* Def.'s Rebuttal Comments at 27–28.)

With respect to Usinor Sacilor's argument that "it is unreasonable for Commerce to require a showing that the parent company receiving the subsidies would likely pass on the benefits to its foreign subsidiaries," Commerce argues this argument is premised in part on the fungibility of money theory. (Def.'s Rebuttal Comments at 28 (citation and quotations omitted).) Commerce responds that as noted above, the tying presumption exists as an exception to the fungibility theory. Usinor Sacilor's contention that Commerce's approach imposes a heightened burden of proof that cannot be reconciled with Commerce's treatment of "virtually identical evidence" in the *Austrian Final Determination* is flawed, Commerce counters: "[T]he evidence in the French case did not show that the French government intended to benefit Usinor Sacilor's foreign operations," Commerce replies, whereas "the Austrian government expressly directed in a statute that [the Austrian steel company] was to use the subsidy funds at issue to cover its losses 'at home or abroad.'" (*Id.* at 29.)

### b. British Final Determination

BS plc is wrong, Commerce argues, when it argues evidence that HMG had knowledge of BSC's foreign operations and failed to restrict BSC's use of equity infusion funds is sufficient to rebut the presumption. As explained in the *Sales Denominator Remand,* Commerce maintains BS plc has not established, for example, "that HMG affirmatively communicated to BSC that it could use the subsidy funds for whatever purpose it desired, without limit, or, as in the [*Austrian Final Determination*], that BSC could use the subsidy funds 'at home or abroad.'" (*Sales Denominator Remand* at 26, *quoted in* Def.'s Rebuttal Comments at 30.) The presumption would be of little use, Commerce adds, "if the mere absence of express evidence of the government's desires was sufficient to rebut it." (*Id., quoted in* Def.'s Rebuttal Comments at 30.) The implication of BS plc's argument, Commerce responds, is "that the tying presumption should only arise once there is evidence of ... affirmative steps taken by the government to ensure that the subsidy funds at issue are used only for domestic purposes." (Def.'s Rebuttal Comments at 31.) This view is untenable, Commerce reasons, as

> one reason for adopting the presumption in the first place is that the affirmative evidence contemplated here by BS plc ordinarily will be solely in the possession of the respondent government or firm. If the presumption could not arise until this evidence were produced, Commerce rarely would be able to use the presumption or establish tying.

(*Id.*)

Commerce rejects BS plc's argument that Commerce should have found that the evidence rebutting the tying presumption for the fiscal year 1984/85 equity infusions rebuts the presumption for the entire period during which BSC received subsidies. Commerce maintains "BS plc's only rationale for demanding this treatment is that otherwise the burden on a respondent to produce tying evidence would be 'unreasonable.'" (*Id.* at 32.) BS plc offers no basis for its assertion that the evidentiary burden is unreasonable, Commerce replies, and none in fact exists.

### C. Domestic Producers

#### 1. The Tying Presumption

Domestic Producers support Commerce's adoption of the tying presumption as a reasonable method of defining the sales denominator for a subsidy recipient that is a multinational producer. Domestic Producers cite with approval Commerce's finding that the presumption is consistent with the intent of the CVD statute as it "facilitates a full offset of countervailable subsidies." (Domestic Producers' Rebuttal Comments in Support of the Final Results of Redetermination Re: Denominator (Domestic Producers' Rebuttal Comments) at 6 (footnote omitted).) A rational connection between known and presumed facts is manifested in part, Domestic Producers assert, by Commerce's observation that " 'a government normally would provide a subsidy to a firm with multinational production for domestic purposes.' " (*Id.* at 7 (quoting *Sales Denominator Remand* at 9).)

As to plaintiffs' other objections to the tying presumption, Domestic Producers agree with Commerce that whether equity infusions could be subjected to a tying analysis or to the tying presumption was not an open issue on remand. In the event the Court does consider this issue, Domestic Producers continue, plaintiffs' fungibility and equity arguments are misguided. Domestic Producers reject plaintiffs' analogy of a blood transfusion to describe the effects of equity infusions on a firm, because, Domestic Producers argue, "the flow of resources ... within a company reflects *choices* by company managers, who divert theoretically fungible funds to specific uses. By comparison, the flow of blood is not subject to decisions; it goes randomly where the veins take it, without regard to corporate managers or government policy." (*Id.* at 11.) Domestic Producers argue that although fungible resources theoretically can be used for anything, this does not mean that resources are likely to be used for everything equally. It is this point that the tying presumption addresses, Domestic Producers continue, as it

establishes that "it is appropriate to allocate [subsidies] according to which of the many outcomes made theoretically possible by fungibility is most likely to occur." (*Id.* at 12.) Domestic Producers also suggest plaintiffs' fungibility arguments are inconsistent as BS plc "argues that because of fungibility, no subsidy can ever be tied to any particular type of production," (*id.* (footnote omitted)), while Usinor Sacilor "tries to avoid dragging down all tying by insisting that equity infusions are somehow special" and cannot be tied, (*id.* at 14).[27]

#### 2. Application of the Tying Presumption to Record Evidence

##### a. French Final Determination

Usinor Sacilor has misapplied the law, Domestic Producers argue, when they argue *Creswell* requires Commerce to prove Usinor Sacilor's rebuttal evidence was " 'neither accurate nor sufficient.' " (*Id.* at 22 (quoting Usinor Sacilor's Comments at 22 (further citation omitted)).) Domestic Producers contend that in *Creswell,* the CAFC "held that the evidentiary burden of production shifted back to the Department precisely *because* the respondents in that case had presented evidence sufficient to rebut the presumption. Here, Foreign Producers failed to rebut the presumption; accordingly, the burden did not shift to the Department." (*Id.* at 22 (footnote omitted).)

Domestic Producers dispute Usinor Sacilor's charge that Commerce ignored rebuttal evidence. Domestic Producers cite to passages in the *Sales Denominator Remand* where Commerce discussed evidence that Usinor Sacilor claims Commerce ignored. In a point by point examination of certain record evidence, Domestic Producers discount Usinor Sacilor's interpretations of the evidence, and claim Commerce properly found Usinor Sacilor failed to rebut the tying presumption. (*See id.* at 23–27.)

##### b. British Final Determination

Domestic Producers agree with Commerce that evidence showing the absence of any

---

**27.** Domestic Producers also oppose plaintiffs' attack on the general principles Commerce erected to apply the presumption. These challenges are without merit, Domestic Producers charge, and should be rejected. (*See* Domestic Producers' Rebuttal Comments at 17–21.)

explicit restrictions on the use of section 18(1) funds, references to foreign operations in BSC's annual reports, and the allegation that HMG knew BSC was expending money on non-UK activities is not sufficient to rebut the tying presumption. Domestic Producers also reject BS plc's argument that Commerce "improperly discounted the evidentiary value of corporate plans and budget forecasts which reference 'fixed assets abroad.'" (*Id.* at 29 (citing BS plc's Comments at 6).) "The category of capital requirements listed as 'fixed assets abroad,'" Domestic Producers argue, "also included entirely domestic matters, such as 'net investment in UK companies, net investment in long and medium-term financial assets and changes in working capital.'" (*Id.* (footnote omitted).) Thus, Domestic Producers maintain, this evidence is inconclusive and Commerce properly found it did not rebut the tying presumption. Finally, evidence of a 1978/79 British Steel Corporation (International) Ltd. annual report allegedly demonstrating a BSC foreign subsidiary suffered losses is insufficient to rebut the tying presumption, Domestic Producers argue, as "nothing in that report gave any indication whatsoever that any subsidy funds were likely to be used to offset those losses." (*Id.* at 30.)

### DISCUSSION

#### A. *The Tying Inquiry*

■■ The Court first considers the issue of Commerce's resort to a tying inquiry when investigating firms with multinational production. Because the language of the CVD statute is silent on this issue, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782 (footnote omitted). In its review of the agency's answer, "[t]hough a court may reject an agency interpretation that contravenes clearly discernible legislative intent, its

role when that intent is not contravened is to determine whether the agency's interpretation is 'sufficiently reasonable.'" *American Lamb Co. v. United States,* 4 Fed.Cir. (T) 47, 54, 785 F.2d 994, 1001 (1986) (citations omitted), *quoted in Grupo Indus. Camesa v. United States,* 853 F.Supp. 440, 442 (CIT 1994). Plaintiffs' arguments that Commerce's tying analysis is inconsistent with the fungibility of money principle do not persuade the Court to reject Commerce's resort to a tying inquiry as an unreasonable interpretation of the CVD statute. The legislative history to the Trade Agreements Act of 1979, Pub.L. No. 96–39, 93 Stat. 144 (1979), makes clear Commerce is required to allocate subsidies over products that have benefited from the subsidies.[28] To effect this allocation, Commerce must ascertain which products have benefited from countervailable subsidies. Commerce then must allocate countervailing duties over such products in a manner that reasonably reflects the extent to which the products have benefited from the subsidies.

It is consistent with Congressional intent for Commerce to reject the view that subsidies bestowed on a company are equally beneficial to all products made by a company in all cases. As Commerce notes in the *Sales Denominator Remand,* if the fungibility of money principle were applied without exception, the result would be "'to allocate all benefits, regardless of their intent or effect, over a company's total sales. This ... raises the specter of having to dilute benefits (perhaps to *de minimis* levels) that we know are tied to products under investigation.'" *Sales Denominator Remand* at 40 (quoting *Industrial Nitrocellulose,* 52 Fed.Reg. at 835). Therefore, Commerce's traditional tying analysis carves out exceptions to the fungibility of money principle in certain circumstances.[29] As Commerce has explained:

**28.** *See* S.Rep. No. 249 at 85, *reprinted in* 1979 U.S.C.C.A.N. at 471 ("Reasonable methods of allocating the value of ... subsidies over the production or exportation of the products benefiting from the subsidy must be used."); H.R.Rep. No. 317, 96th Cong. 1st Sess. 75 (1979) ("[I]n calculating the *ad valorem* effect of non-recurring subsidy grants or loans, reasonable methods of allocating the value of such subsidies

over the production or exportation of products benefitting from them will be used.").

**29.** Prior to *France Bismuth,* Commerce made two exceptions to the general principle of the fungibility of money: (1) where a domestic subsidy is tied to a particular product or products; and (2) where an export subsidy is tied to a particular market. *General Issues Appendix,* 58

If Congress had intended that we universally apply the fungibility concept, we would have to countervail export subsidies on sales to countries other than the United States, allocate export subsidies on U.S. sales over total sales instead of over only export sales, and dilute benefits tied to a product under investigation by allocating them over total sales.

*Industrial Nitrocellulose from France,* 51 Fed.Reg. 5386, 5387 (Dep't Comm.1986) (prelim. admin. review). This view is in accord with numerous investigations by Commerce analyzing the relationship between a tying inquiry and the fungibility of money principle. *See Sales Denominator Remand* at 38–40 (citations omitted). Accordingly, Commerce's explanation that the tying inquiry made in these investigations exists as an exception to the fungibility of money principle is sustained.

The Court also notes that Commerce's resort to a tying inquiry in *France Bismuth,* which involved some of the same subsidies at issue in this proceeding, has been upheld by the Court:

[T]he court finds that Commerce has articulated a reasoned basis for analyzing this issue via a "tying" inquiry.... [T]o the extent that Commerce's methodology does represent a departure from past practice, the court finds that Commerce's decision to engage in a "tying" inquiry was based upon reasoned analysis.... This aspect of [*France Bismuth*] is therefore sustained.

*Usinor Sacilor,* 893 F.Supp. at 1139 (citation and footnote omitted). Plaintiffs have raised no persuasive arguments undermining the Court's holding in *Usinor Sacilor.* In light of the above, the Court holds Commerce resort to a tying inquiry in cases where a multinational firm's sales include non-domestic production is based on substantial evidence and is otherwise in accordance with law.

B. *The Adoption of the Tying Presumption*

In discussing the adoption of the tying presumption in *British Steel,* this Court observed "[o]n the basis of the record evidence produced thus far in this action, it appears Commerce has sufficiently explained its adoption of the tying presumption." *British Steel,* 879 F.Supp. at 1316. The Court went on to state, however, it was "premature for the Court to decide whether Commerce has provided a reasoned analysis for adopting the tying presumption because interested parties had neither notice of the new presumption nor the opportunity to present evidence to rebut the presumption." *Id.* In compliance with the Court's order, Commerce afforded interested parties notice and the opportunity to comment on the tying presumption and to present evidence to rebut the presumption. After the parties' full participation on remand, Commerce affirmed its decision to adopt the tying presumption and subsequently applied the presumption to the evidence in these investigations.

■ Although an administrative agency has the power to create a presumption, the presumption "must rest on a sound factual connection between the proved and inferred facts." *NLRB v. Baptist Hosp., Inc.,* 442 U.S. 773, 787, 99 S.Ct. 2598, 2606, 61 L.Ed.2d 251 (1979); *see also United Scenic Artists, Local 829 v. NLRB,* 762 F.2d 1027, 1034 (D.C.Cir.1985) ("Presumptions may, of course, be established both by legislative bodies and by administrative agencies, but their validity depends as a general rule upon a rational nexus between the proven facts and the presumed facts.") (citing *McCormick on Evidence* § 344 at 969 (3rd ed. 1984)) (further citations omitted). Additionally, "courts have the duty to review the [agency's] presumptions both 'for consistency with the [statute], and for rationality.'" *Baptist Hosp., Inc.,* 442 U.S. at 787, 99 S.Ct. at 2606 (quoting *Beth Israel Hosp. v. NLRB,* 437 U.S. 483, 501, 98 S.Ct. 2463, 2473, 57 L.Ed.2d 370 (1978)); *see also Rhone Poulenc, Inc. v. United States,* 8 Fed.Cir. (T) 61, 67, 899 F.2d 1185, 1191 (1990) (finding Commerce's "presumption implements the basic purpose of the statute"). In sum, an agency presumption must be both consistent with the intent

Fed.Reg. at 37,234 (citing 54 Fed.Reg. 23,366, 23,383–84 (Dep't Comm.1989) (to be codified at 19 C.F.R. § 355.47(a), (b)) (proposed May 31, 1989)).

of the statute and based upon a rational connection between the facts proven and the facts presumed.

The Court in *British Steel* found "Commerce's explanation that its tying presumption is consistent with the intent of the relevant statute because the presumption aids Commerce in determining the appropriate denominator appears reasonable on its face." *British Steel*, 879 F.Supp. at 1316. Plaintiffs in this proceeding have raised no arguments that would lead the Court to waver from this finding. The purpose of countervailing duties is "to offset the unfair competitive advantage that foreign producers would otherwise enjoy from export subsidies paid by their governments." *Zenith Radio Corp. v. United States*, 437 U.S. 443, 456, 98 S.Ct. 2441, 2448, 57 L.Ed.2d 337 (1978) (citations omitted). In this vein, Congress directed the administering agency that "in the case of nonrecurring subsidy grants or loans.... [r]easonable methods of allocating the value of such subsidies *over the production or exportation of the products benefiting from the subsidy* must be used." S.Rep. No. 249 at 85, *reprinted in* 1979 U.S.C.C.A.N. at 471 (emphasis added). Commerce is not required, of course, to trace the actual effects of subsidies, and therefore Commerce cannot know with certainty the actual value of products benefitting from subsidies. The tying presumption does establish, however, a reasonable inference that subsidies to companies with both domestic and foreign production will *likely benefit* the company's domestic production. *See Sales Denominator Remand* at 53 ("[T]he use of the presumption provides the best means for identifying the *likely beneficiaries* of the subsidy benefits....") (emphasis added). This inference is consistent with the intent of the statute directing Commerce to "allocat[e] the value of ... subsidies over the production or exportation of the products benefiting from the subsidy."

The Court also finds the tying presumption is based upon a rational connection between the facts proven and the facts presumed. Commerce observed:

[I]t is reasonable to presume that the government of a country normally provides subsidies for the general purpose of promoting the economic and social health of that country and its people, and for the specific purposes of supporting, assisting or encouraging domestic manufacturing or production and related activities (including, for example, social policy activities such as the employment of its people). Conversely, that same government would not normally be motivated to promote, at what would be considerable cost to its own taxpayers, manufacturing or production or higher employment in foreign countries.

*General Issues Appendix*, 58 Fed.Reg. at 37,231; *see also Sales Denominator Remand* at 10. Usinor Sacilor's complaint that this rationale "has no valid foundation" is not well-taken. First, as the Court observed in *British Steel*, Commerce has extensive experience identifying and allocating equity infusions, grants, and other subsidies in CVD investigations. *British Steel*, 879 F.Supp. at 1316. Second, Usinor Sacilor's critique that Commerce's rationale is at variance with the analysis contained in certain economic texts misses the point. Commerce is not required to advance a methodology that is the most reasonable, nor the most economically rational—it need only set forth a methodology that is consistent with the intent of the statute and one that is based on substantial evidence and is otherwise in accordance with law. *See IPSCO, Inc. v. United States*, 12 CIT 359, 364–65, 687 F.Supp. 614, 620 (1988) (holding Commerce's interpretation of CVD statute "need not be the most reasonable interpretation, or the only reasonable interpretation") (citing *Zenith Radio Corp.*, 437 U.S. at 450, 98 S.Ct. at 2445). For the Court to find that because the rationale underpinning the tying presumption is not in accord with certain economic teachings the tying presumption is unlawful would distort the standard of review this Court is charged with applying. The Court finds Commerce has advanced a reasoned analysis for erecting the tying presumption in these investigations. Accordingly, the Court holds Commerce's adoption of the tying presumption to assist the agency in making its factual determination of tying in cases where a multinational firm's sales include non-domestic production is based on

substantial evidence and is otherwise in accordance with law. 

### C. Application of the Tying Presumption to Record Evidence

■■■ Usinor Sacilor's arguments challenging two of the general principles Commerce erected in applying the tying presumption to the record evidence in these investigations—namely, Commerce's separate examination of each subsidy and Commerce's decision not to consider evidence of subsequent events tending to demonstrate the actual effects or uses of the subsidies at issue—simply present alternative perspectives on how Commerce should apply the tying presumption. As part and parcel of the tying presumption itself, these general principles remain within the discretion of the agency to adopt and will not be disturbed absent a showing they are not based on substantial evidence or are not otherwise in accordance with law. The Court agrees "government approvals and conditions for subsidy bestowals ... may change from one year to the next," thus it is reasonable for Commerce to examine each subsidy separately in the year bestowed. The principle that Commerce will not consider evidence of subsequent events to demonstrate the actual effects of subsidies is consistent with the agency's traditional tying practice. *See Usinor Sacilor*, 893 F.Supp. at 1141. Usinor Sacilor's attempt to challenge this practice is not persuasive. Commerce's decision to examine subsidies separately in the year bestowed and to ignore evidence of subsequent events tending to demonstrate the actual effects or uses of subsidies are both reasonable exercises of the agency's discretion in administering the CVD statute.

■■■ Usinor Sacilor's complaints against Commerce's application of the tying presumption in this case have no merit. The tying presumption is a *rebuttable* presumption; Commerce described a variety of evidence that may rebut the presumption including a "catch-all" category for "any other evidence addressing the likely beneficiaries of the subsidy." Plaintiffs' argument that Commerce precluded all evidence of likely effects other than the intent of the government is not borne out by the record in this proceeding.[30] Commerce expressly stated that no one type of evidence is decisive and that the agency will weigh the rebuttal evidence presented on a case by case basis. Furthermore, once a party presents evidence "tending to show" that the subsidies at issue are not tied to domestic production, the presumption is rebutted. That is, the party must present enough evidence so that a reasonable fact-finder could be convinced of the non-existence of the presumed fact—that the subsidies at issue are tied to the recipient firm's domestic production. *See Sales Denominator Remand* at 15–16. Contrary to Usinor Sacilor's contention that Commerce has set the burden of producing rebuttal evidence "so high that persons in the position of respondents cannot meet it," the Court finds both the type and quantum of evidence necessary to rebut the tying presumption are reasonable. *See A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1037 (Fed.Cir.1992) (citations omitted).

### 1. French Final Determination

■■■ None of the arguments advanced by Usinor Sacilor convince the Court that Commerce erred in finding Usinor Sacilor failed to rebut the tying presumption. Commerce duly considered record evidence Usinor Sacilor advanced to rebut the presumption and concluded it was insufficient. Usinor Sacilor's charge that Commerce "ignor[ed] or steadfastly misinterpret[ed] record evidence" is contradicted by a plain reading of the *Sales Denominator Remand.* For example, Usinor Sacilor contends Com-

---

**30.** *See Sales Denominator Remand* at 35–45. The Court agrees with Commerce that a government's intent or purpose in bestowing subsidies may be some evidence of the likely beneficiaries of subsidies, and thus may serve as evidence rebutting the tying presumption. Intent may be relevant to how subsidy benefits are allocated when applying the principles of tying. The intent of the subsidizing government, however, is not dispositive as to whether subsidies were in fact bestowed or whether such subsidies exist. *See British Steel Corp. v. United States*, 9 CIT 85, 96, 605 F.Supp. 286, 294 (1985) (concluding the government's domestic purposes in providing funds "are not controlling of the question of whether such largess constitutes countervailable subsidies.")

merce failed to consider that the GOF's principal intention in granting certain subsidies was to improve the company's weak financial condition and to cover the company's accumulated consolidated losses, both domestic and foreign. (*See* Usinor Sacilor's Comments at 18 (footnote omitted).) In the *Sales Denominator Remand*, however, Commerce did consider such evidence finding that it did not tend to show how or why any foreign subsidiaries likely would benefit from the subsidies provided to Usinor Sacilor. *See Sales Denominator Remand* at 19–22, 68–72. Similarly, Usinor Sacilor's claim that Commerce ignored evidence concerning the 1986 debt-to-equity conversions is belied by Commerce's discussion of such evidence in the *Sales Denominator Remand* at pages 74–78. As the fact-finder in these complex investigations, Commerce is charged with surveying the record and making a determination; the agency's decision need not be the most correct, nor the one the Court would have reached had the Court considered the evidence *de novo*.[31] The Court only need be assured the decision reached by Commerce is based on substantial evidence and is otherwise in accordance with law. The Court holds Commerce's determination that Usinor Sacilor failed to rebut the tying presumption as to the conversion of PACS and FIS bonds into equity in 1981, 1986, and 1988, and as to the grants given in the form of shareholders' advances from 1982 through 1986 is based on substantial evidence and is otherwise in accordance with law.

### 2. *British Final Determination*

The Court holds Commerce's determination that BS plc failed to rebut the tying presumption for subsidies provided pursuant to equity infusions made under section 18(1) of the Iron and Steel Acts of 1975 and 1982 in fiscal years 1977/78 through 1985/86, with the exception of the equity infusions in fiscal year 1984/85, is based on substantial evi-

dence and is otherwise in accordance with law. BS plc fails to advance any convincing arguments otherwise. For example, BS plc contends evidence showing HMG knew the company was expending cash on non-UK activities during the period it was receiving subsidies and that HMG failed to advise the company that subsides could not be used for that purpose is sufficient evidence to rebut the presumption. Commerce found that such evidence alone could not rebut the tying presumption because it establishes little more than that HMG provided subsidies to the company and that the company was engaged in multinational production at that time. The Court cannot say Commerce's interpretation of the evidence is unreasonable. BS plc merely raises a conflicting view of the evidence, which alone does not undermine Commerce's determination. *See Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) ("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.") (citations omitted).

The Court also sustains Commerce's decision that BS plc provided sufficient evidence to rebut the presumption that subsidies provided under section 18(1) for fiscal year 1984/85 were tied to domestic production. BS plc's argument that Commerce should have found the presumption was rebutted for the entire period the company received subsidies is unavailing, as the Court has upheld Commerce's general principle of examining each subsidy at issue separately in the year bestowed.

In conclusion, the Court holds the *Sales Denominator Remand* setting forth a rebuttable presumption that a subsidy provided by the government of the country under investigation is tied to the domestic production of the recipient where the recipient is a multinational firm whose sales include non-domestic production and applying the tying pre-

---

**31.** *See Penntech Papers, Inc. v. NLRB*, 706 F.2d 18, 22 (1st Cir.) ("[T]he court may not substitute its judgment for that of [Commerce] when the choice is 'between two fairly conflicting views, even though the court would justifiably have made a different choice has the matter been before it *de novo* . . . .' ") (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951)), *cert. denied*, 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983), *quoted in Hercules, Inc. v. United States*, 11 CIT 710, 726, 673 F.Supp. 454, 469 (1987).

sumption to the *French Final Determination* and the *British Final Determination,* is sustained as based on substantial evidence and otherwise in accordance with law.

CONCLUSION

After considering Commerce's *Allocation Remand* and the comments of all parties, the Court holds the *Allocation Remand,* setting forth a method of determining the allocation period over which to allocate the benefits of nonrecurring subsidies using the company-specific average useful life of renewable physical assets and applying the allocation methodology to the *French Final Determination* and the *British Final Determination,* is sustained as based on substantial evidence and otherwise in accordance with law.

After considering Commerce's *Sales Denominator Remand* and the comments of all parties, the Court holds the *Sales Denominator Remand,* setting forth a rebuttable presumption that a subsidy provided by the government of the country under investigation is tied to the domestic production of the recipient where the recipient is a multinational firm whose sales include non-domestic production and applying the tying presumption to the *French Final Determination* and the *British Final Determination,* is sustained as based on substantial evidence and otherwise in accordance with law.

*British Steel plc. v. United States,* Consol. Court No. 93–09–00550–CVD, consisting of

*British Steel plc. v. United States,* Court No. 93–09–00550–CVD and *Geneva Steel,* et al. *v. United States,* Court No. 93–09–00572–CVD, is hereby dismissed.[32]

JUDGMENT ORDER

These consolidated actions in this joint proceeding having been duly submitted for decision on the general issues of allocation and sales denominator, after due deliberation, it is hereby

**ORDERED** that the *Final Results of Redetermination Pursuant to Court Remand on General Issue of Allocation* (dated June 30, 1995), is sustained; and it is further

**ORDERED** that the *Final Results of Redetermination Pursuant to Court Remand on General Issue of Sales Denominator* (dated June 23, 1995), is sustained; and it is further

**ORDERED** that *British Steel plc. v. United States,* Consol. Court No. 93–09–00550–CVD, consisting of *British Steel plc v. United States,* Court No. 93–09–00550–CVD and *Geneva Steel,* et al. *v. United States,* Court No. 93–09–00572–CVD, is hereby dismissed.

---

**32.** Notwithstanding the dismissal of *British Steel plc. v. United States,* Consol. Court No. 93–09–00550–CVD, in the instant opinion and accompanying judgment order, the Court will continue to use *British Steel plc. v. United States,* Consol. Court No. 93–09–00550–CVD, as the identifier of this joint proceeding. This will not interfere, however, with the ability of the parties in *British Steel plc. v. United States,* Consol. Court No. 93–09–00550–CVD, consisting of *British Steel plc v. United States,* Court No. 93–09–00550–CVD and *Geneva Steel,* et al. *v. United States,* Court No. 93–09–00572–CVD, to appeal all issues of allocation and sales denominator they have challenged in the course of this proceeding. *Cf. British Steel PLC,* 924 F.Supp. at 153 n. 14.

The Court also notes there remain certain country-specific issues pending in *Inland Steel Industries, Inc.,* et al. *v. United States,* Consol. Court No. 93–09–00567–CVD. Accordingly, the Court will issue its final judgment in *Inland Steel Industries, Inc.,* et al. *v. United States,* Consol. Court No. 93–09–00567–CVD, at the time of disposition of those country-specific issues.